(No. 48876.—

THE BALTIMORE & OHIO RAILROAD COMPANY,
Petitioner, v. VICTOR J. MOSELE, Judge, *et al.,*
Respondents.

*Opinion filed June 1, 1977.—Rehearing denied Oct. 3, 1977.*

324

DOOLEY and GOLDENHERSH, JJ., dissenting.

Richard E. Boyle and Richard F. Nash, of Gundlach, Lee, Eggman, Boyle & Roessler, of Granite City, for petitioner.

David H. Adamson III, of Callis, Schooley, Filcoff & Hartman, of Granite City, for respondent.

MR. JUSTICE RYAN delivered the opinion of the court:

This action arises from a petition for a writ of *mandamus* filed in this court. Petitioner, the Baltimore and Ohio Railroad Company (hereinafter referred to as B & O) is the named defendant in 32 cases now pending in Madison County. The suits allege personal injuries and are brought pursuant to the Federal Employers' Liability Act (45 U.S.C. sec. 51 *et seq.* (1970)). A substantial majority of the 32 cases arise from incidents which occurred outside of the State of Illinois. Petitioner contends that venue for these actions does not lie in Madison County. Petitioner's motion to transfer to a county of proper venue was denied

by the respondent judge, Mosele, whereupon petitioner instituted the present original action which involves only the case of respondent Robert Genheimer. We granted leave to file a petition for writ of *mandamus* (58 Ill. 2d R. 381(a)) and now hold that the circuit court erroneously failed to grant petitioner's request for change of venue.

The following facts were revealed by discovery procedures instituted in connection with petitioner's motion to transfer venue, and by affidavits submitted to the circuit court. The B & O is a foreign corporation authorized to transact business in this State. It is conceded that the B & O operates railroad facilities and maintains offices in 19 counties in Illinois. The B & O has no offices or operating facilities within Madison County, and the incidents from which the actions arose did not take place in that county. One of the counties in which the B & O operates extensive facilities is St. Clair County, which is immediately south of Madison County.

B & O railroad cars and equipment are used in Madison County by other railroads. B & O cars frequently pass through Madison County under the operation and control of the Terminal Railroad Association (hereinafter referred to as TRRA). The TRRA is an independent railroad corporation, incorporated under the laws of the State of Missouri, which operates throughout Madison County. The B & O owns 6.25% of the stock of the TRRA. The remaining shares are owned by various other railroad companies. The TRRA functions as a terminal and interchange facility for other railroads which ship freight to or from the city of St. Louis, Missouri. The TRRA terminal yards straddle the boundary between St. Clair and Madison counties in Illinois. B & O engines and crews deliver cars to this terminal, where they are turned over to TRRA crews. Though the record is not entirely clear on the matter, it appears that on infrequent occasions parts of a B & O train operated by a B & O crew would cross the

county dividing line. These incursions into Madison County all occurred during the process of "yarding" a train in order that it could be turned over to TRRA crews.

The record also discloses that the B & O solicited business from Madison County shippers and that the solicitation generated a substantial amount of revenue for the company. The deposition of the district sales manager of the B & O revealed that he is assigned specific accounts in Madison County and that he spends approximately three days a month contacting shippers within the county. This solicitation of business is not conducted from an office within Madison County.

At issue is whether the B & O railroad is "doing business" within Madison County for purposes of the venue statute. Section 5 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 5) provides that every action must be commenced in the county of the defendant's residence, or in the county where the cause of action arose. Section 6 of the Civil Practice Act defines the residence of a corporation for venue purposes:

> "Any private corporation or railroad or bridge company, organized under the laws of this State, and any foreign corporation authorized to transact business in this State is a resident of any county in which it has its registered office or other office or is doing business." Ill. Rev. Stat. 1975, ch. 110, par. 6(1).

As previously mentioned, the causes of action involved in this proceeding did not arise from activities in Madison County, and the B & O maintains no offices in that county. Thus, venue will lie in Madison County only if it can be demonstrated that the B & O is "doing business" in the county.

Respondents assert that the facts reveal several bases upon which venue in Madison County may be upheld. First, respondents contend that the occasional physical incursions of B & O trains into Madison County while in the TRRA terminal yards constitute "doing business" in

the county. Secondly, respondents contend that the unique relationship between the TRRA and its shareholders demonstrates that the B & O is doing business in Madison County through the agency of the TRRA. Lastly, respondents contend that the B & O is doing business in Madison County by virtue of its solicitation of shippers within the county.

At the outset, we must emphasize that this case concerns the proper interpretation to be placed upon the phrase "doing business" as it is used in the context of the venue statute. The term has a long history in the law and for many years was utilized as a statement of the test for determining when a corporation would be amenable to suit in a foreign jurisdiction. (See generally 4 Wright and Miller, Federal Practice and Procedure sec. 1066 (1969).) As a result, the phrase "doing business" has been the subject of myriad judicial interpretations, the vast majority of which considered the term only in a jurisdictional context. (See Words and Phrases, "Doing Business".) No firm rule as to what constitutes doing business for jurisdictional purposes is discernible from the cases. As Judge Learned Hand stated: "It is quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass." *Hutchinson v. Chase & Gilbert, Inc.* (2d Cir. 1930), 45 F.2d 139, 142.

In *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154, the United States Supreme Court set to rest a great part of the confusion which had resulted from the "doing business" cases. *International Shoe* determined that a nonresident defendant is amenable to suit in a jurisdiction, and due process of law is satisfied, where he has "minimum contacts" with the forum State "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158.

We have commented upon the background of the term "doing business" because counsel for both parties have cited and relied upon decisions which interpret the phrase within the context of personal jurisdiction. These decisions are only marginally helpful in determining the issue at hand. Jurisdiction and venue are distinct legal concepts. Jurisdiction relates to the power of a court to decide the merits of a case, while venue determines where the case is to be heard. Statutory venue requirements are procedural only and do not have any relation to the question of jurisdiction. (*United Biscuit Co. of America v. Voss Truck Lines, Inc.* (1950), 407 Ill. 488.) The Illinois venue statute is designed to insure that the action will be brought either in a location convenient to the defendant, by providing for venue in the county of residence, or convenient to potential witnesses, by allowing for venue where the cause of action arose. Sunderland, *Observations on the Illinois Civil Practice Act,* 28 Ill. L. Rev. 861 (1934).

We have not previously interpreted the phrase "doing business" as that term relates to venue in section 6 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 6). Respondents would have us incorporate the *International Shoe* test into our interpretation. In short, respondents contend that venue in Madison County is proper if the B & O had minimal contacts with that county such that maintenance of a suit there would not offend traditional notions of fair play and justice. We reject this contention.

Section 17 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 17) extends the personal jurisdiction of the Illinois courts to the extent permitted by the due process clause as interpreted in *International Shoe* and the cases it has spawned. (*Nelson v. Miller* (1957), 11 Ill. 2d 378, 389.) Section 17 accomplishes this expansion, in part, by providing that any person submits to the jurisdiction of the courts of this State as to any cause of action arising from "[t]he transaction of any business within this State."

(Ill. Rev. Stat. 1975, ch. 110, par. 17(1)(a).) Clearly, the language of section 17, referring to the "transaction of any business," is far broader than the language of section 6, which places venue in any county in which the defendant is "doing business." See generally Note, *Doing Business as a Test of Venue and Jurisdiction over Foreign Corporations in the Federal Courts,* 56 Colum. L. Rev. 394, 416 (1956).

A comparison of the literal terms of sections 6 and 17 demonstrates that the legislature intended that more extensive contacts with a county are necessary to establish proper venue than are required when the issue is whether the defendant is subject to the jurisdiction of the courts of this State. It would be a distortion of the plain meaning of the words of the venue statute to hold that a corporation is "doing business" within any county with which it has even minimal contacts. Additionally, such a construction of section 6 of the Civil Practice Act would have the effect of negating the principle of convenience upon which section 5 of the Act is based. To judicially define the "doing business" provision of the venue statute as being synonomous with the test for establishing jurisdiction under section 17 would be to allow the institution of actions in locations with little connection with the defendant and with no connection with the activities which give rise to the suit.

We hold, therefore, that in order to establish that a defendant is doing business within a county for purposes of venue, quantitatively more business activity within the county must be demonstrated than where the question is whether the defendant has transacted any business within the State for purposes of service of process pursuant to section 17. The defendant must, in short, be conducting its usual and customary business within the county in which venue is sought. In the words of one Federal court faced with a similar problem of construction, "the activity must

be of such a nature so as to localize the business and make it an operation within the district." (*Remington Rand, Inc. v. Knapp-Monarch Co.* (E.D. Pa. 1956), 139 F. Supp. 613, 617.) With these principles in mind, we consider the particular bases upon which respondents assert that proper venue lies in Madison County.

We do not accept respondent's initial contention that venue in Madison County is established by the infrequent movements of B & O trains across the county boundary line while in the TRRA terminal yards. As previously mentioned, the record is unclear as to the frequency and extent of the incursions. It is clear, however, that the slight movements of the B & O trains into Madison County occurred only in the course of "yarding" the train in order that it could be transferred to the control of the TRRA crews, and, then, only when the length of the train required that part of it be moved into Madison County so that the rear of the train would clear the B & O yards in St. Clair County. There is no suggestion in the record that the B & O operated trains in Madison County on a scheduled basis, or that it was even aware that parts of its longer trains might cross the county line while in the interchange terminal. Certainly, it cannot be said that these incursions constituted the usual and customary operation of a railroad enterprise within Madison County. In our view, the B & O cannot be said to be "doing business" in Madison County on this basis.

Respondents next contend that the B & O is doing business in Madison County through the agency of the TRRA. The fallacy in respondent's argument, however, is that the record does not, in fact, disclose that the TRRA is the agent of the B & O or that the B & O exercises any influence or control over the TRRA.

Affidavits and answers to respondent's interrogatories reveal that the B & O is the owner of 6.25% of the stock of the TRRA; that one of the directors of the TRRA is also

an officer of the B & O; that the B & O and the TRRA are separate and distinct railroad corporations; that the B & O does not exercise any control over the TRRA; that the TRRA is owned by 13 separate railroad corporations; and that the TRRA interchanges cars with approximately 19 other railroads. This was the sum of the information concerning the status of the TRRA which was in the record before the trial court.

At best, this information establishes that the B & O owned stock in another railroad corporation with which it, and numerous other railroads, interchanged cars. The B & O did not direct or control the day-to-day operations of the TRRA, nor did B & O crews operate the trains after they had been placed under the control of the TRRA. Upon the basis of the record before us, we cannot say that the TRRA was the legal agent of the B & O or that the B & O was operating its usual and customary business within Madison County under the aegis of the TRRA.

Respondents rely, however, upon a decision of the United States Supreme Court to support their contention that the TRRA is the agent of the B & O and, presumably, of all the other railroads which utilize the TRRA interchange facilities. In *United States v. Terminal Railroad Association* (1912), 224 U.S. 383, 56 L. Ed. 810, 32 S. Ct. 507, the United States brought an antitrust action against the TRRA and other defendants. The court found that the TRRA, as then organized, constituted a restraint of trade in that the railroad companies which held a proprietary interest in the terminal association were able to control the commerce entering St. Louis to the disadvantage of the nonproprietary railroad companies. (224 U.S. 383, 409-10, 56 L. Ed. 810, 819, 32 S. Ct. 507, 515.) The Supreme Court remedied this situation by ordering a reorganization of the TRRA, the effect of which was that the association had to act as "the *bona fide* agent and servant of every railroad line which shall use its facilities." 224 U.S. 383,

410-11, 56 L. Ed. 810, 810, 32 S. Ct. 507, 516.

We do not consider this decision to be relevant to a determination of whether the B & O was doing business in Madison County for venue purposes. The fact that the Supreme Court employed the word "agent" in ordering a remedy for an illegal restraint of trade does not establish that the TRRA is the legal representative of the B & O in Madison County. There is no indication in the record that the B & O controls the daily operations of the TRRA or its personnel. In fact, all evidence in the record is to the contrary. The weakness of respondent's position is indicated by the fact that were we to accept the proposition we would be required to hold that approximately 13 competing railroads are doing business in Madison County merely because they utilize the interchange facilities of the TRRA. In our opinion, the B & O's ownership of a portion of the stock of the TRRA and its utilization of the terminal association's interchange facilities do not constitute the doing of business for venue purposes in Madison County.

Respondent's third contention is that the activities of the B & O district sales manager in Madison County constituted the doing of business there. During the course of a deposition, the district sales manager testified that he was assigned a territory which included Madison County, Illinois, south St. Louis and some of north St. Louis. He testified that he had specific accounts in Madison County and that he had spent approximately three days a month in the county. The freight which results from his solicitation is delivered to the B & O at points outside Madison County by the TRRA. The district sales manager also testified that he would from time to time engage in telephone discussions with TRRA personnel concerning the necessary equipment to be delivered by the TRRA to his Madison County customers. He also testified that a shipping customer who suffered a loss of goods would file

a claim with the B & O, though the record does not show that any particular claim was filed or how a claim is treated once it has been filed.

It is respondent's position that the solicitation of business in Madison County is, in and of itself, the doing of business for venue purposes in the county. Alternatively, respondent asserts that the activities of petitioner's sales manager amount to more than the simple solicitation of business.

In discussing this issue, both petitioner and respondent rely upon cases where the question was whether a nonresident was subject to the jurisdiction of the forum state. The cases relied upon did not interpret the phrase "doing business" in the context of a venue question. The long-standing rule in Illinois is that the mere solicitation of business is not "doing business" for purposes of jurisdiction. (*G. W. Bull & Co. v. Boston & Maine R. R. Co.* (1931), 344 Ill. 11; *Booz v. Texas & Pacific Ry. Co.* (1911), 250 Ill. 376; *Lindley v. St. Louis - San Francisco Ry. Co.* (7th Cir. 1968), 407 F.2d 639.) Respondents invite us to change this rule. It is respondent's contention that the "mere solicitation" rule is derived from early decisions of this court and that those cases retain little or no vitality as a result of the *International Shoe* decision.

We need not, and do not, reach the merits of respondent's contention. This case, because it involves the venue provisions of the Civil Practice Act, does not present the opportunity to reconsider the "mere solicitation" rule. As we have already held, quantitatively more business activity is necessary to establish the defendant's residence in a county for venue purposes than is required where the issue is the defendant's amenability to suit within the State. For venue purposes, mere solicitation of business within a county does not establish venue in that county.

Nor do we consider the other activities of the petitioner's district sales manager sufficient to establish

that the B & O is doing business in Madison County as that term is used in section 6. The record reveals that the only service provided by petitioner's employee was merely incidental to the solicitation of shipping business. This service was to occasionally assist TRRA employees in finding sufficient freight cars to deliver to shippers within Madison County, with delivery always being made by the TRRA. Respondents also assert that the B & O settles claims within Madison County, but the record does not bear out this point. In short, the activities of petitioner's district sales manager amount to no more than solicitation of business and are not sufficient to constitute doing business for venue purposes.

The extraordinary remedy of *mandamus* is issued only in the sound discretion of this court and will generally not lie to correct mere judicial errors. (*People ex rel. Continental Air Transport Co. v. Strouse* (1969), 41 Ill. 2d 567.) However, *mandamus* has been utilized to correct clear errors in the application of mandatory venue requirements. (*People ex rel. Norwegian-American Hospital, Inc. v. Sandusky* (1961), 21 Ill. 2d 296.) In light of the clear absence of facts sufficient to support venue in Madison County, and cognizant of the large number of similar cases pending in Madison County against the petitioner, we determine that a writ of *mandamus* should issue.

The writ of *mandamus* will therefore issue, directing respondent, as judge of the circuit court of Madison County, to enter an order transferring the case of Robert Genheimer v. The Baltimore & Ohio Railroad Company, No. 75-L-952, to a county of proper venue.

*Writ awarded.*

MR. JUSTICE DOOLEY, dissenting:

Here the majority would grant this court's extraordinary writ of *mandamus* to transfer these actions to one of

the 19 counties in which petitioner admits it is doing business. Amongst these is St. Clair County, the seat of which is Belleville, less than 15 miles from Edwardsville, the seat of Madison County. This is not a *forum non conveniens* situation, but a matter of venue only. In our opinion it would be plain error to grant this writ.

The considerations which we shall discuss in detail are these:

(1) *Mandamus* is not a proper vehicle for the relief sought. It cannot be employed as an interlocutory appeal. Nor can issues of fact be determined in *mandamus.*

(2) These actions are brought under an act of Congress (Federal Employers' Liability Act, 45 U.S.C. sec. 51 *et seq.* (1970)). The rights created by them are Federal rights. Section 6 of the FELA (45 U.S.C. sec. 56 (1970)) makes a defendant amenable to process wherever it is doing business. It need not "be conducting its usual and customary business within the county in which venue is sought" as the majority holds.

(3) The defendant is "doing business" within Madison County within the meaning of those terms in the FELA as they have been construed not only by *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154, but also in a series of significant decisions. It is likewise doing business within the meaning of that phrase in our venue statute (Ill. Rev. Stat. 1975, ch. 110, par. 6(1)).

(4) The Terminal Railroad Association (TRRA) is its agent under decisions of the United States Supreme Court and other courts; a summons served upon the TRRA representative in Madison County would be service upon the petitioner.

We shall consider the foregoing seriatim.

*Mandamus* is sought not only to order the respondent to act, but to act in a particular way. Whether the ruling of the judge was erroneous and, if so, to what extent, are

matters which we are called upon to decide. But it is a well-established rule that "[f]or mere error, however gross or manifest, the remedy is an appeal or writ of error, and the writ of *mandamus* will not lie for its correction if the court has jurisdiction of the subject matter and the parties." *People ex rel. Barrett v. Shurtleff* (1933), 353 Ill. 248, 259-60; *People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1958), 12 Ill. 2d 515, 523.

*Mandamus* should not issue where its object is to circumvent the normal appellate process. (*People ex rel. Sears v. Romiti* (1971), 50 Ill. 2d 51, 55; *People ex rel. Castle v. Spivey* (1957), 10 Ill. 2d 586, 591.) *Mandamus* does not lie where the result is to fragment the appeal. (*People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1958), 12 Ill. 2d 515, 523; *People ex rel. Clark v. McRoberts* (1881), 100 Ill. 458, 461.) The proper remedy for errors in the trial proceedings is an appeal, not a petition for writ of *mandamus. People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1958), 12 Ill. 2d 515, 520.

Highly analogous is a motion for change of venue. Although the motion may be improperly denied, *mandamus* will not lie to review such an order. In *People ex rel. Clark v. McRoberts* (1881), 100 Ill. 458, 461, this court, in denying an original application for leave to file a petition for a writ of *mandamus* from a denial of a change of venue, noted:

"After an examination of the authorities, and the briefs of the parties, we are of opinion that the writ will not lie. *** If the writ was allowed in this case compelling the court to enter a mere interlocutory order, we see no reason why it might not be asked for and granted in every case while the suit was progressing, compelling the court to enter particular orders. In other words, it would be to bring up the case in fragments from

the court below, and have every ruling of that court passed upon during the progress of the case, and in that way bring cases before the court where there was no final judgment or determination in the court below."

What reason compels a different rule here is not known.

As if that were not enough, the petition raises issues of fact concerning the contacts of petitioner with Madison County. Such issues are not a proper consideration in original actions for a writ of *mandamus.* Only issues of law will be considered. Supreme Court Rule 381 (58 Ill. 2d R. 381); *Touhy v. State Board of Elections* (1976), 62 Ill. 2d 303, 312; *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 557.

That there are issues of fact here is evident from the majority opinion. "[T]he record is unclear as to the frequency and extent of the incursions" of petitioner's trains into Madison County. Again, "the record does not, in fact, disclose that the TRRA is the agent of the B & O or that the B & O exercises any influence or control over the TRRA." And again, "[u]pon the basis of the record before us, we cannot say that the TRRA was the legal agent of the B & O or that the B & O was operating its usual and customary business within Madison County under the aegis of the TRRA."

The impropriety of *mandamus* here is reinforced by the proposition that so long as the defendant makes a timely objection to the propriety of the venue, as was done here, its position is preserved (Ill. Rev. Stat. 1975, ch. 110, par. 8). *United Biscuit Co. of America v. Voss Truck Lines, Inc.* (1950), 407 Ill. 488, 501.

It appears obvious, therefore, that the threshold question, namely, whether *mandamus* will lie here, must be decided adversely to petitioner.

It is well established that the FELA confers Federal

rights. These rights are governed by Federal law. *Dice v. Akron, Canton & Youngstown R.R. Co.* (1952), 342 U.S. 359, 96 L. Ed. 398, 72 S. Ct. 312; *Brown v. Western Ry.* (1949), 338 U.S. 294, 94 L. Ed. 100, 70 S. Ct. 105; *Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, *cert. denied* (1957), 355 U.S. 37, 2 L. Ed. 2d 49, 78 S. Ct. 63; *Grunenthal v. Long Island R.R. Co.* (1968), 393 U.S. 156, 21 L. Ed. 2d 309, 89 S. Ct. 331.

So also is it fundamental that the decisions of the United States Supreme Court control State courts in actions under this statute. (*Dice v. Akron, Canton & Youngstown R.R. Co.* (1952), 342 U.S. 359, 96 L. Ed. 398, 72 S. Ct. 312; *Garrett v. Moore-McCormack Co.* (1942), 317 U.S. 239, 87 L. Ed. 239, 63 S. Ct. 246; *Harsh v. Illinois Terminal R.R. Co.* (1953), 351 Ill. App. 272, *appeal denied* (1954), 2 Ill. 2d 631, *rev'd on other grounds* (1955), 348 U.S. 940, 99 L. Ed. 736, 75 S. Ct. 362.) When a State opens its courts to suitors under the FELA, it is "required to give petitioner [plaintiff] the full benefit of federal law." (*Garrett v. Moore-McCormack Co.* (1942), 317 U.S. 239, 243, 87 L. Ed. 239, 242, 63 S. Ct. 246, 250.) In *Garrett,* the Pennsylvania Supreme Court, in an action under the Jones Act, which incorporates the FELA by reference (46 U.S.C. sec. 688), held that since the plaintiff chose to bring his action in the State rather than in the Federal court, the court could employ State rather than Federal rules. But in a reversing opinion, the United States Supreme Court stated that the Jones Act, like the FELA, "is to have a uniform application throughout the country, unaffected by 'local views of common law rules.' *Panama R. Co. v. Johnson,* 264 U.S. 375, 392." (*Garrett v. Moore-McCormack Co.* (1942), 317 U.S. 239, 244, 87 L. Ed. 239, 243, 63 S. Ct. 246, 250.) This uniformity applies in each step in the litigation, from the pleadings to the appellate process.

In *Brown v. Western Ry.* (1949), 338 U.S. 294, 94 L.

Ed. 100, 70 S. Ct. 105, local rules of pleading could not impair these Federal rights. In *Dice v. Akron, Canton & Youngstown R.R. Co.* (1952), 342 U.S. 359, 96 L. Ed. 398, 72 S. Ct. 312, the validity of a release was to be determined by a jury, not by the judge, according to the State law, although the action was commenced in a State. *Garrett v. Moore-McCormack Co.* (1942), 317 U.S. 239, 87 L. Ed. 239, 63 S. Ct. 246, deals with uniformity of burden of proof.

The scope of review is part and parcel of the remedy under the Act. (*Lavender v. Kurn* (1946), 327 U.S. 645, 90 L. Ed. 916, 66 S. Ct. 740; *Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, *cert. denied* (1957), 355 U.S. 837, 2 L. Ed. 2d 49, 78 S. Ct. 63.) In *Bowman* the Illinois Appellate Court was prohibited from setting aside a verdict as contrary to the manifest weight of the evidence, although it had the unquestioned power to do so in other cases. Nor can a verdict be set aside by a reviewing court on the claim of excessiveness unless it would be a denial of justice to permit the verdict to stand. *Grunenthal v. Long Island R.R. Co.* (1968), 393 U.S. 156, 21 L. Ed. 2d 309, 89 S. Ct. 331.

Here section 6 of the Act (45 U.S.C. sec. 56 (1970)) provides that an action may be brought in the district in which the defendant shall be "doing business" at the time of the commencement of the action, and that the jurisdiction of the courts of the United States shall be concurrent with that of the State courts. If the action may be maintained in a district court where the defendant is doing business, certainly it would appear that such is the test for whether such an action may be maintained in the State court.

In *Miles v. Illinois Central R.R. Co.* (1942), 315 U.S. 698, 86 L. Ed. 1129, 62 S. Ct. 827, wherein the railroad brought an action in the Tennessee chancery court to enjoin the maintenance of an action under this statute in a Missouri court alleging that the decedent and the dece-

dent's children as well as the defendants were residents of Tennessee, the court, in a reversing opinion, after noting that the jurisdiction of the State's court was concurrent with Federal jurisdiction, observed:

"The opportunity to present causes of action arising under the F. E. L. A. in the state courts came, however, not from the state law but from the federal. By virtue of the Constitution, the courts of the several states must remain open to such litigants on the same basis that they are open to litigants with causes of action springing from a different source. This is so because the Federal Constitution makes the laws of the United States the supreme law of the land, binding on every citizen and every court and enforceable wherever jurisdiction is adequate for the purpose. \*\*\* Since the existence of the cause of action and the privilege of vindicating rights under the F. E. L. A. in state courts spring from federal law, *the right to sue in state courts of proper venue where their jurisdiction is adequate is of the same quality as the right to sue in federal courts.*" (Emphasis added.) 315 U.S. 698, 703-04, 86 L. Ed. 1129, 1134, 62 S. Ct. 827, 830-31.

In a concurring opinion in *Miles,* Mr. Justice Jackson observed:

"Unless there is some hidden meaning in the language Congress has employed the injured workman or his surviving dependents may choose from the entire territory served by the railroad any place in which to sue, and in which to choose either a federal or a state court of which to ask his remedy. There is nothing which requires a plaintiff to whom such a choice is given to exercise it in a self-denying or large-hearted manner. There is nothing to restrain use of that

privilege, as all choices of tribunal are commonly used by all plaintiffs to get away from judges who are considered to be usympathetic, and to get before those who are considered more favorable; to get away from juries thought to be small-minded in the matter of verdicts, and to get to those thought to be generous; to escape courts whose procedures are burdensome to the plaintiff, and to seek out courts whose procedures make the going easy." 315 U.S. 698, 706-07, 86 L. Ed. 1129, 1135, 62 S. Ct. 827, 832.

In the famous *Kepner* case, wherein an Ohio court sought to enjoin a railroad employee and citizen of Ohio from proceeding with the prosecution of his action under the FELA in the United States District Court for the Eastern District of New York, the court, in reversing, traced the history of section 6 and observed:

"The language finally adopted must have been deliberately chosen to enable the plaintiff, in the words of Senator Borah, who submitted the report on the bill, 'to find the corporation at any point or place or State where it is actually carrying on business, and there lodge his action, if he chooses to do so.' " *Baltimore & Ohio R.R. Co. v. Kepner* (1941), 314 U.S. 44, 50, 86 L. Ed. 28, 31-32, 62 S. Ct. 6, 8.

While we are aware that certain courts (*Ledbetter v. Sanford* (1947), 212 Ark. 277, 205 S.W.2d 464; *James v. Nashville, C. & St. L. Ry.* (1949), 310 Ky. 616, 221 S.W.2d 449; *Missouri Pacific R.R. Co. v. Little* (Tex. Civ. App. 1958), 319 S.W.2d 785, 787) would take the position that State law on venue governs, nonetheless, we believe that venue under this series of United States Supreme Court decisions covering all phases of litigation under the Act is a federally protected right. Certainly the majority position is not illustrative of a liberal construc-

tion of the Act and its humanitarian purposes—matters of which the United States Supreme Court continuously remind all inferior courts. *Rogers v. Missouri Pacific R.R. Co.* (1957), 352 U.S. 500, 509, 1 L. Ed. 2d 493, 501, 77 .S. Ct. 443, 450; *Urie v. Thompson* (1949), 337 U.S. 163, 181-82, 93 L. Ed. 1282, 1299, 69 S. Ct. 1018, 1030; *Lilly v. Grand Trunk Western R.R. Co.* (1943), 317 U.S. 481, 486, 87 L. Ed. 411, 415, 63 S. Ct. 347, 351.

As if that were not enough, our own venue statute provides the same "doing business" test as does section 6 of the FELA. The General Assembly in its wisdom has provided that "[a]ny private corporation or railroad or bridge company *** is a resident of any county in which it *** is doing business. (Ill. Rev. Stat. 1975, ch. 110, par. 6(1).) Neither Congress nor the Illinois General Assembly has required that in order to be conducting business there must be a qualitative amount of "business activity" or that the party must "be conducting its usual and customary business," or if a railroad be involved, it must operate "trains in Madison County on a scheduled basis." We fail to see what right we have to engraft additional conditions upon the terms established by Congress and the Illinois General Assembly.

Then, of course, there is the *International Shoe Company* decision (*International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154), where a court had jurisdiction of a defendant so long as the contacts of the party with the jurisdiction were sufficient not to offend traditional notions of fair play and substantial justice. In *International Shoe* the defendant corporation had several commissioned salesmen who took orders in the State of Washington. It is true that *International Shoe* involved not venue but the issue whether the court had jurisdiction of the party. In a proceeding without jurisdiction of the party, certain basic due process principles are at issue. It would seem that if the contacts with

the particular forum are sufficient to give a court jurisdiction on that basis, then it would follow that the corporation is doing business for venue purposes.

Professor Moore in his work on Federal practice observed: "[W]e believe that if a corporation is amenable to service of process it should be held to be 'doing business' for venue purposes." (1 Moore, Federal Practice sec. 0.142 [5.–1–3], at 1411-13 (1974).) This is based upon the principles of fairness which constitute the foundation for *International Shoe*. If it is not unfair to subject a corporation to jurisdiction, it is not unfair to subject it to suit in a particular venue.

Wright, in his treatise on Federal courts, concludes the sensible answer to the question of what is meant by doing business is to use the same test for both venue and jurisdiction. (Wright, Federal Courts sec. 42, at 176 (3d ed. 1976).) "There is much to be said for the view that if a corporation is doing enough business in a district to satisfy the constitutional tests on when it may be subjected to process there, that district should be a proper venue." 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure sec. 3811, at 65 (1976).

Incisively in point is *Kilpatrick v. Texas & P. Ry. Co.* (2d Cir. 1948), 166 F.2d 788. There the defendant operating a railroad in Texas, Arkansas and Louisiana was sued in the Southern District of New York. It allegedly maintained an office of eight employees who continually solicited business in New York. Judge Learned Hand held that the continuous solicitation of business was itself "doing business." *Kilpatrick* cannot be distinguished from the instant situation.

The antiquated character of the concept of venue expressed in the majority opinion is demonstrated by a 1914 United States Supreme Court decision, *International Harvester Co. of America v. Kentucky* (1914), 234 U.S. 579, 586, 58 L. Ed. 1479, 1482, 34 S. Ct. 944, which

describes *Green v. Chicago, Burlington & Quincy Ry. Co.* (1907), 205 U.S. 530, 51 L. Ed. 916, 27 S. Ct. 595, as "an extreme case." In this pre-*International Shoe* decision the court stated:

> "This was a course of business, not a single transaction. The agents not only solicited such orders in Kentucky, but might there receive payment in money, checks, or drafts. They might take notes of customers, which notes were made payable, and doubtless were collected, at any bank in Kentucky. This course of conduct of authorized agents within the State in our judgment constituted a doing of business there in such wise that the Harvester Company might be fairly said to have been there, doing business, and amenable to the process of the courts of the State.
>
> \* \* \*
>
> We are satisfied that the presence of a corporation within a State necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the State \*\*\*." (234 U.S. 579, 585-89, 58 L. Ed. 1479, 1482-83, 27 S. Ct. 944, 946-47.)

Such language is descriptive of the course of business the defendant did in Madison County. When it satisfied the due process concept of jurisdiction, it certainly met venue requisites as defined both by our statute (Ill. Rev. Stat. 1975, ch. 110, par. 6(1)) and the Act of Congress (45 U.S.C. sec. 56).

The *International Shoe* decision was a response to the developed use of the corporate form of a business undertaking. It marked the formulation of a new due process test. Under its terms personal jurisdiction can be obtained, although the quantity of contact may be

comparatively minor. In the final analysis the fairness element is controlling.

In *McGee v. International Life Insurance Co.* (1957), 355 U.S. 220, 2 L. Ed. 2d 223, 78 S. Ct. 199, the only contact involved the issuance of a life insurance policy and the payment of premiums. The Empire Mutual Insurance Company, an Arizona corporation, issued a policy to a California citizen. Empire Mutual's obligations were subsequently assumed by International Life. From Texas, International Life's office, a reinsurance certificate was sent to the California insured whereby International offered to insure his life. The insured accepted the offer and continued to mail premiums from California to International's office in Texas.

Neither corporation had transacted or solicited business in California except with the insured. In an action in California to recover on the policy, the United States Supreme Court held that International Life, a Texas corporation, had the requisite "minimum contacts" to satisfy the *International Shoe* test. The court arrived at its conclusion by weighing the respective interests and determined that plaintiffs should not be forced to go to a distant State to hold the company accountable.

It is true that the "minimum contacts" test is not easily defined. Yet it undeniably represents a balancing of interests—that of the defendant, that of the plaintiff, and that of the State in which the action is filed—to determine whether subjection to *in personam* jurisdiction of the particular court is offensive to well-established concepts of fair play and justice.

*Department of Revenue v. National Bellas Hess, Inc.* (1966), 34 Ill. 2d 164, 175, *rev'd on other grounds* (1967), 386 U.S. 753, 18 L. Ed. 2d 505, 87 S. Ct. 1389, was an action to recover a summary judgment entered against the defendant in the circuit court of Cook County for sums assessed under the Illinois Use Tax Act (Ill. Rev. Stat.

1961, ch. 120, par. 439.1 *et seq.*). The defendant maintained in Illinois no office, distribution house, sales house or warehouse or any other place of business. It had no agents, saleman, canvasser, solicitor or other type of representative to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise it sold. Nor did it own any tangible property in Illinois or have any telephone listing or advertisement in Illinois. From North Kansas City it mailed two catalogs annually to Illinois customers. This court predicated jurisdiction of the circuit court of Cook County upon the defendant's continuous solicitation in Illinois and mailing of goods into this State. *National Bellas Hess* cannot be reconciled with the majority.

That the defendant was doing business in Madison County is manifest from the consideration of the facts. It had three employees engaged in the continuous process of solicitation of business in this county. As a result of their work, the petitioner, over a period of five years, handled over 25,000 cars for Madison County shippers and collected over $10,000,000 from them during the same period. Madison County was the principal territory of its ticket manager, who not only sold the services of petitioner but aided Madison County shippers in getting necessary services from other roads. Petitioner's trains with its yard crews would enter Madison County.

As if that were not enough, the TRRA is the judicially defined agent and servant of the petitioner. The United States Supreme Court required that the TRRA be constituted "the *bona fide* agent and servant of every railroad line which shall use its facilities" in order to avoid antitrust violations. (*United States v. Terminal R.R. Association* (1912), 224 U.S. 383, 410-11, 56 L. Ed. 810, 820, 32 S. Ct. 507, 516.) Subsequently, the Interstate Commerce Commission noted that "it is clear that the Terminal has adhered strictly to the mandate of the Supreme Court that

it shall constitute itself as 'the *bona fide* agent and servant of every railroad line which shall use its facilities.' This, in a measure, supports the statement appearing in certain of our reports that the properties of the Terminal represent, in legal and practical effect, the extension of the east-side lines into St. Louis and of the west-side lines into East St. Louis." (*Laclede Steel Co. v. Louisville & Nashville R.R. Co.* (1937), 222 I.C.C. 321, 324. To that effect see *Manufacturers Ry. Co. v. Ahnapee & Western Ry. Co.* (1931), 172 I.C.C. 554, 563; *Chicago, Rock Island & Pacific Ry. Co. v. Baltimore & Ohio R.R. Co.* (1926), 113 I.C.C. 681, 685.) Obviously, service of process upon the TRRA in Madison County would be service of process upon the petitioner because of the relationship between petitioner and the TRRA.

The TRRA, whose facilities are used by petitioner, admittedly operates trains in Madison County, and meets even the unique and extreme test of "doing business" articulated by the majority.

We submit that in view of the foregoing, it is error to cause the writ of *mandamus* to issue directing the circuit judge to grant the motion to dismiss for improper venue. In our opinion, the petition for *mandamus* ought to be denied.

MR. JUSTICE GOLDENHERSH joins in this dissent.