MERLIN C. STAMBAUGH, Plaintiff-Appellee, *v.* INTERNATIONAL HARVESTER COMPANY, Defendant-Appellant.

Fifth District    No. 80-175

Opinion filed April 14, 1982.

2

WELCH, J., concurring in part and dissenting in part.

Owen, Roberts, Susler & Murphy, of Decatur, and Lord, Bissell & Brook, of Chicago (Robert D. Owen, Forrest L. Tozer, Richard E. Mueller, and Hugh C. Griffin, of counsel), for appellant.

Hillebrand, Cook & Shevlin, Ltd., of East St. Louis, and Flynn & Flynn, of Jacksonville (Bruce N. Cook and Leo F. Carroll, of counsel), for appellee.

JUSTICE JONES delivered the opinion of the court:

Following a seven-week trial, a jury returned verdicts against defendant for $650,000 in compensatory damages and $15,000,000 in punitive damages. The court, finding that the verdict of $15,000,000 punitive damages was "shocking to the conscience," ordered a remittitur of $7,500,000 on the punitive damages award, which plaintiff accepted, and judgment was entered for plaintiff in the amount of $8,150,000. Defendant appeals.

Plaintiff was seriously injured by mostly second-degree burns to his body while he was operating his tractor in May 1975. The burns were caused when he was sprayed with gasoline that had geysered or spurted from the tank of his tractor. The geysering allegedly resulted when pressure built up in the gas tank of the tractor to such an extent that the gas cap was blown off the tank. The defendant had manufactured the tractor, a Farmall model 706, in 1963.

Plaintiff's action against defendant was based upon strict liability in tort for the design and manufacture of a tractor with a faulty gas cap and gas tank assembly that would permit the build-up of pressure in the gas tank when the tank was subjected to heat from operation of the engine. The fuel cap alleged to have been blown off was a triple-baffle cap with three internal chambers, designed to contain liquid fuel. On the top of the fuel cap there was a vent-hole 1/16 inch in diameter which allowed pressure to escape from, rather than build up within, the fuel tank.

Plaintiff's complaint was in two counts. The first alleged a cause of action based upon strict liability in tort, and the second asked for punitive damages based upon defendant's wilful misconduct. The trial of the case encompassed six days of pretrial hearings, 32 days of trial before the jury and six days of post-trial hearings. Throughout, 74 witnesses gave testimony, and a transcript of 4,612 pages was compiled. Basically, plaintiff's experts criticized the design of the model 706 because its fuel tank was placed too close to the engine without sufficient heat-shielding and because the vent-hole in the fuel tank cap was too small. Plaintiff maintained that he had tightened the cap all the way so that the tangs of the cap were against the metal lugs inside the rim of the filler neck. Defendant's position was that it was impossible for a securely fastened triple-baffle cap to be blown off.

On appeal defendant raises several issues. Defendant's first claim is that St. Clair County was an improper place for trial and error was committed by not transferring the case to a county of proper venue. Defendant's next three issues are related. It contends that plaintiff's statement that the fuel cap was securely fastened constituted a judicial admission which precluded him from presenting a theory inconsistent with that statement and precluded jury instructions based upon an alternative theory. Similarly, defendant contends that since plaintiff's statement was a binding judicial admission, and since the experts all agreed that a securely fastened triple-baffle cap could not be blown off, there was insufficient evidence as a matter of law to support plaintiff's claim. Defendant also contends that there was insufficient evidence to present the issue of discovery fraud to the jury. Defendant asserts that error occurred in the admission of evidence concerning other accidents and that this error was compounded by improper closing argument.

Defendant's final contentions are that the jury deliberations were tainted by the presence of nonevidentiary materials in the courtroom where the jury was left to deliberate and by the trial court's refusal to answer a question propounded by the jury during deliberation. As a result of these errors, defendant claims, both the compensatory and punitive verdicts were grossly excessive.

Following a lengthy pretrial discovery process, defendant sought a change of venue, claiming both that St. Clair County was the improper venue and that pretrial publicity concerning the settlement of the companion Gauges case made a fair trial impossible. The motion was denied, and the case proceeded to trial with plaintiff calling Seymour Croft, under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60) (hereafter section 60). Croft, an attorney employed by defendant to supervise staff attorneys handling products liability cases, was questioned about experiments he had requested defendant's engineers to perform. He stated that when an experiment is performed at an attorney's direction in anticipation of litigation, information with respect to it is privileged and as a result he had often written to engineers telling them not to discuss or divulge results of experiments. Croft was then examined about interrogatory answers he gave in the Missouri case of Greathouse v. International Harvester. In that case defendant was asked to list all cases of fuel-geysering or blowups known by defendant to have occurred within the past 15 years. Croft stated that such a question would include everything in defendant's manufacturing line from lawnmowers to trucks. Therefore, in accordance with the instructions he had received from local Missouri counsel, he had answered the question by disclosing only all the cases involving tractors in any way similar to the model 424 involved in Greathouse. Croft admitted that in drawing the line between similar and dissimilar tractors he had followed engineering advice.

Plaintiff's next witness was William Borghoff, an engineer with defendant's product integrity group. Borghoff made several testimonial appearances throughout the case. He testified that his job included the investigation of accidents and that he had investigated the accident giving rise to the Greathouse case. He stated that he did not know who had made the decision in that case to limit interrogatory answers to only those cases involving what were determined to be similar tractors, but, he stated, to have done otherwise would have required several years of compilation. Over defendant's continuing objection, Borghoff several times denied that he had made the decision to limit interrogatory answers in Greathouse. However, Borghoff admitted that two cases of alleged geysering were not revealed in the Greathouse case because, even though the fuel caps and vent-holes were identical, the tractors were deemed to be dissimilar. Borghoff was asked why he did not disclose the geysering

problems involved in the Greathouse case during his deposition in this case. He replied that he did not consider the model 424 tractor involved in Greathouse to be a "farm" tractor and he believed that he was being questioned only about fires involving farm tractors. During his testimony Borghoff expressed the opinion that he could see no circumstances under which geysering could occur in the normal use of plaintiff's model 706 tractor. Although he expressed that opinion repeatedly throughout the trial, he admitted that in the Gauges case a similar tractor had been involved and in that case he had initially hypothesized that fuel-geysering might have been caused by a build-up of pressure in the fuel tank which could have resulted from blockage of the vent-hole of the fuel cap by the windshield. Borghoff admitted that under special laboratory conditions liquid fuel could be forced out of the filler spout by the effervescence of gaseous vapors such as liquid can be forced by carbon dioxide out of a bottle of soda after it is shaken. Borghoff stated that in the late 1950's design changes were effected which resulted in the placement of a heat deflector shield between the fuel tank and the engine of model 300 tractors so as to eliminate fuel geysering problems. He stated, however, that making comparisons between model 300 and model 706 tractors was like mixing apples and oranges, especially since the model 706 used a sophisticated triple-baffle cap.

In support of his contention that Borghoff's opinion was incorrect and that geysering could occur in the model 706 tractor, plaintiff presented the depositions of four farmers and the testimony of a fifth to establish that they had experienced similar occurrences. All of the tractors involved in those instances were models which undisputed testimony established as having the same basic radiator, engine and fuel tank configuration as that of model 706. Two of the farmers stated that fires in their tractors had been preceded by accumulating fuel tank pressure which blew off securely fastened triple-baffle fuel caps. A third farmer related a similar experience except for the fact that a service station attendant had fastened the fuel cap, so that he could not state of his own knowledge that it had been securely fastened. Two other farmers testified that when they had taken fuel caps off their tractors, gasoline started spurting through the vent-hole as pent-up pressure was relieved, fuel had spurted out and then ignited. Throughout its case plaintiff offered the testimony and depositions of many other users of International Harvester tractors, all of whom related similar geysering incidents. Although many of those incidents involved tractors similar to plaintiff's model 706, some of the incidents for which evidence was presented involved earlier models of tractors which lacked the same basic configuration as plaintiff's model 706.

Plaintiff called as a witness James Buatt, whose court appearance is

the source of considerable controversy in this case. Buatt testified that in 1959 his securely fastened fuel cap was blown off a 300 tractor and the resulting fuel geyser ignited and severely burned him. The burns suffered by Mr. Buatt resulted in severe disfigurement and, we gather from verbal descriptions in the record, a hideous appearance. Defense counsel strenuously objected to Buatt's appearance before the jury, stating that his testimony would add little to the testimony of the other farmers and that any value such testimony would add could be presented by way of deposition so that his gross disfigurement would not prejudice and impassion the jury. Defendant's motion was denied, although plaintiff's counsel was instructed not to question Buatt about specific injuries. Defendant's subsequent motion for a mistrial was denied, and no photographic evidence of Buatt's appearance has been placed in the record for appellate review.

Appearances by two other witnesses, Robert Gauges and Buddy Brown, were also objected to by defendant, both because of their physical appearance and because of the large amount of local publicity that had been given to the recent settlement of the Gauges case. Their testimony was largely cumulative to that given by other farmers. Vivid descriptions of the physical appearance of these witnesses, as well as of witness Buatt, were made by plaintiff's attorney in closing argument.

Plaintiff called as witnesses under section 60 several of defendant's engineers, some of whom were long-time employees. Although they generally admitted that pressure build-up problems had caused geysering with earlier models of tractors than the 706, they denied that geysering could occur, even under abnormal conditions, with tractors having a design configuration similar to that of plaintiff's model 706. Despite these denials, engineers employed by defendant also admitted that an internal company report had questioned fuel pressure build-up in a model similar to the 706 and that another similar model had been redesigned in the early 1960's to reduce the exposure of the fuel tank to engine heat.

The engineers disclosed a 1958 report which revealed that effervescence of the fuel would be more likely on warm spring days when a more volatile winter fuel was being used. It was undisputed that a warm spring day was a common factor in all but a few of the geysering fires of which evidence was presented at trial. Although one engineer attempted to clarify the 1958 report by distinguishing a gaseous effervescence from the type of geysering involved here, that same engineer admitted hearing of tests which had shown geysering could occur at "a fairly low pressure." Although none of the engineers would state what that pressure was, they steadfastly and uniformly denied that any amount of pressure could blow off a securely fastened fuel tank cap.

It was admitted that testing is performed at the factory on tractors

meeting production specifications, a procedure which is unlikely to occur with older tractors once they are in use in the field. Over an objection that the expert's opinion was not subject to discovery because it was a work product, plaintiff was allowed to introduce the opinion of an expert, retained but not used by defendant in litigation of another case, that a diameter of 1/16 of an inch for the vent-hole in the triple-baffle fuel tank cap of the model 706, and other similar models, was too small to release the pressure to be anticipated. The engineers also disclosed that larger vent-holes and repositioning of the tank had been recommended in internal company reports in order to eliminate the spurting of fuel encountered in models of tractors older than the 706 but that, despite those opinions, the 1/16-inch vent-hole was not enlarged until after the accident involved in this case. A chief engineer of defendant admitted that several years after the event he had discovered that certain tests had been performed which might suggest the possibility of geysering but that these tests had not been shown to him because the attorneys requesting the tests had instructed the engineers performing them not to keep records of the results. However, despite the revelations made, and despite the engineers' refusal to give an estimate of the pressure necessary to create artificially induced geysering, they were still of the opinion that geysering could not occur during field use of a model 706 or similarly designed tractors.

Plaintiff also attempted to show, by calling defendant's supervising attorney and one of its corporate vice-presidents, that defendant had been guilty of fraud in discovery. Although the alleged improprieties involved discovery during the Gauges case, the court allowed evidence of it because of prior agreements and orders which provided that discovery in that case was to be used in both that case and the one at bar. At trial the supervising attorney admitted knowing of at least 15 allegations of geysering; however, he stated he had learned of several of them only recently, long after interrogatory answers had been given in Gauges. He stated that during discovery in the Gauges case he and another employee had searched the files of their Chicago counsel and failed to discover a letter revealing additional cases. Such a letter was later found by plaintiff's counsel when he was invited to search the Chicago law firm's files. The supervising attorney related that it was not until long after the discovery process was completed in the Gauges case that he learned that the Chicago counsel had relevant files in three locations rather than in the one location the supervising attorney had searched. The supervising attorney strongly denied plaintiff's suggestions that the three locations were designed to secrete records from the plaintiff. The attorney did admit learning of the Brown case, another geysering-fire case against defendant, only four days after he had signed a discovery affidavit, but

stated that although he had not supplemented the affidavit he had failed to do so only because he knew plaintiff's counsel had learned of the case at virtually the same time as he. Plaintiff's counsel made no attempt to refute that statement. The corporate vice-president, who at trial admitted knowing of at least 10 cases of tractor fuel fires was asked why he had denied knowing of any such fires in earlier depositions. He replied that he had not denied knowing about other fuel fires but had denied only knowing about other cases of alleged geysering.

Plaintiff presented the testimony of two treating physicians by way of evidence depositions. The emergency room physician who initially treated plaintiff stated that approximately 45 to 60 percent of plaintiff's body had been burned. Most of the burns were second-degree burns, but there were small areas of third-degree burns. He related that only first and second-degree burns are painful since third-degree burns destroy the pain-sensing fibers. Plaintiff had required pain medication every four hours during early treatment, and he had also been treated for smoke inhalation and possible respiratory burns. Plaintiff's family doctor testified that in the year following the injury plaintiff was routinely treated for arthritis and respiratory infection without incident. About 16 months after sustaining the burns plaintiff had a stroke, to which, in the opinion of his doctor, the burn injuries had been a contributing factor.

Plaintiff, a 66-year-old farmer, testified about his May 17, 1975, fire. He stated that it was a warm day, between 75° to 80° F, and that he had worked all morning without any problems. In the afternoon he saw gas shooting from the fuel cap vent-hole and heard a noise coming from that location. As he approached the securely fastened cap it blew off without his ever having touched it, and the geysering fuel then ignited and badly burned him. Pictures of plaintiff's burns were admitted into evidence. Plaintiff detailed how one foot had remained sore until the time of his stroke, which he insisted was approximately a half-year after the accident, rather than a year and a half later as related by the doctor's depositions. Plaintiff related that it had taken him a year and a half to return to work gradually. Plaintiff did admit to prior problems with a hernia as well as some injuries to his arms and legs.

At the conclusion of his case in chief, plaintiff offered the testimony of two expert witnesses. The first was Lee Sapetta, a consulting mechanical engineer. He stated that he had been consulted in other cases against International Harvester and that he had warned defendant that its fuel cap vent-hole was not large enough. In his opinion the model 706 tractor was defectively designed in that it lacked both an adequate system for venting pressure in the fuel tank and insulation for the fuel tank, which would have prevented heat from the engine from causing excessive temperature and pressure that could, in turn, cause geysering of fuel.

Sapetta conceded that in his opinion, even though pressure build-up was a danger, any increased pressure would not be sufficient to blow off a securely fastened cap. However, if the cap were only slightly turned in the opinion of this witness, increased pressure could cause it to be blown off. During cross-examination defense counsel concentrated on the fact that most of Sapetta's time is spent as an expert witness testifying on a great number of different subjects. Defense counsel also emphasized that fact during his closing argument.

Plaintiff's second expert was Wayne Worthington, who had been an engineer since his college graduation in 1910. Prior to his work as a consultant he had been employed at John Deere Company for 29 years. He stated that in 1963 he had been hired as a consultant by International Harvester and in that capacity he had been shown experiments in which water had geysered out of fuel tanks after heat and pressure were applied. He stated that as a result of the tests he had prepared a report for defendant indicating that the condition was dangerous and that the fuel tank and cap designed had a built-in defect. He related that in the early 1950's John Deere Company had experienced similar problems which had been corrected by utilizing a vent-hole 1/4 inch in diameter and by repositioning the fuel tank.

On its own behalf defendant offered the testimony of several of its engineers and key employees. Its director of product reliability testified that from 1939 until the phase out of gasoline engine tractors in the early 1970's approximately 1.6 million of them had been produced. This figure included over 23,000 model 706 tractors which had been produced between 1963 and 1967. He stated that since farm vehicles are not registered as automobiles are, there is no way to contact ultimate consumers directly other than by mailing International Harvester's regular newsletter to the addresses given it by its dealers. The newsletter has a circulation of approximately 600,000 copies. He asserted that safety is a prime concern at International Harvester. When the 706 and 806 models were first introduced there was a slight steering problem, and defendant responded by going into the field to perform the needed repairs. He also testified that where safety is involved repair cost is not even considered as a factor. Furthermore, every time the company had investigated a tractor fire it had found poor maintenance, such as a cracked manifold, as the cause rather than any indication of a product defect. However, he did admit that they could formulate no theory as to how one specified tractor fire had started, and he also admitted that despite a concern for safety only 13,000 of defendant's 1.6 million gasoline-fueled tractors had ever had heat shields installed between the engine and the fuel tank.

Testimony similar to that of the director of product safety was given by defendant's manager of product safety who testified at length about

defendant's commitment to safety and the active support and involvement it had shown for industry-wide safety organizations. The product safety manager admitted that even when he was chairman of an industry-wide safety committee, he was unaware of allegations made about the safety of defendant's fuel tanks by farmers and in internal company memos.

Robert Dahlenberg, a retired International Harvester engineer with nearly 40 years of service with defendant, testified at length concerning defendant's design process. He stated that input came from the entire organization in originating, modifying and improving defendant's tractor line. Dealers were the most influential in determining horsepower requirements and in giving the capability specifications which the design engineers were to meet. In the case of the model 706 defendant developed a completely new tractor rather than to upgrade or make modifications in an older model. The only constraint on design characteristics was that the design allow for use of the tractor with existing implements, and this feature required the fuel tank to be placed in the same position as on previous models. As with all new models, a full scale wooden mock-up was built. This was followed by two experimental prototypes which were built "from the ground up," each component of which was laboratory tested before being added to the assembly. After the two experimental prototypes had been successfully tested by sales personnel and management, 10 more prototypes were built for endurance testing by defendant's personnel and by farmers to whom they were loaned for a period of two years for actual on-farm use before mass production commenced. During the testing only minor hydraulic problems were encountered, and they were quickly remedied. According to Dahlenberg, no fuel problems were discovered during the testing period, and when the model was finally mass-produced the production models performed in the same way as had the prototypes.

Dahlenberg related that he was present when the State of Nebraska, whose testing procedures are accepted industry-wide as the basis for judging performance, had tested the model 706. He remembered that testing well because it was the first totally new tractor for which he had had major responsibility. The Nebraska tests showed the tractor used 4.16 gallons per hour at 50 percent pull and 5.9 gallons per hour at maximum pull, and in Dahlenberg's opinion, even as the vehicle got older, fuel consumption would remain constant at the same carburetor setting. Dahlenberg admitted he was not familiar with any reported model 706 fuel-geysering problems, nor was he familiar with pressure buildup problems in any earlier models other than the 300 and 350. Dahlenberg stated that later 200 and 300 series tractors had had heat shields added during their manufacture and admitted that it would have been better to

have added the shields to models still in use in the field as well. Despite those problems with earlier models, Dahlenberg unequivocally stated that he did not believe that fuel could geyser from a model 706, let alone blow off a securely fastened cap.

Thomas Hillstrom, a safety engineer who had been employed by defendant for 13 years, testified about the physical properties of gasoline. He stated that a good summer grade fuel should contain heavier hydrocarbons with a higher boiling point so that vapor lock can be avoided. On the other hand, a winter-grade fuel requires the more volatile light-weight hydrocarbons which have a lower boiling point in order to start a car better in cold weather. Hillstrom showed the court and jury several graphs, based upon government statistics, which showed that the volatility has increased steadily since 1946, with a dramatic increase in 1975, the year of plaintiff's accident. Hillstrom stated that this increase in the volatility of fuel occurred because a more volatile blend permits more gasoline to be produced from the same amount of crude oil. This phenomenon also encouraged refiners to produce the more volatile winter-grade fuel further into the spring of 1975. The increased fuel volatility would be a major contributing factor to any geysering that might occur on a warm spring day. Hillstrom admitted that geysering was an unpredictable occurrence that could take place even in fuel storage tanks which contained the more volatile fuel. In his opinion gasoline refiners should adopt a policy of warning consumers of fuel-geysering problems as defendant had done with the introduction of warning decals in 1975.

Hillstrom defended the design of the model 706 by explaining the three ways in which heat could be transferred from a source to an object or substance. Radiation is the most effective way to transfer heat, as contrasted with conduction through solid objects, which is the least effective way to transfer heat. Convection, the transfer of heat through air, is somewhere in between radiation and conduction in heat-transfer effectiveness. According to Hillstrom, radiation and conduction are almost nonexistent in the model 706 design, and any other positioning of the fuel tank would have resulted in radiation of heat from the transmission to the fuel tank.

As part of its case in chief, defendant also called William Borghoff, an agricultural engineer with defendant since 1962, in an attempt to discredit the expert testimony given by plaintiff's experts. Borghoff testified that typically the product integrity group will send an investigator to an accident scene within hours after receiving a report to insure fresh recollections of the witnesses and the preservation of evidence. However, in the instant case defendant was not able to get the evidence it would have liked to obtain because it had not been contacted until it had been

served with summons for the lawsuit. Several of the hypothetical questions that plaintiff had posed to its experts were repeated to Borghoff, who stated that there was insufficient information contained in the questions to enable an engineer to reach a scientifically valid opinion.

Defendant called several witnesses, including its supervisory attorney, Thomas Trinley, who testified to the incidents of alleged fraud in discovery. Trinley denied that any wrongdoing or concealment had been committed during the discovery process. He stated that he had never engaged in more extensive discovery than in the Gauges case but nevertheless went to great pains to insure that full disclosure was made. He fully complied with the court's order for discovery and disclosed everything he found when searching the records of defendant's Chicago attorneys. Trinley related that he had never inspected the files of the Chicago attorneys which had been brought to St. Clair County pursuant to a court order, nor had he in any way hindered anyone from bringing those files which, unbeknown to him, contained documents from locations other than those searched by him in Chicago.

Defendant presented the testimony of a retired John Deere Company engineer who stated that Deere, rather than produce its own cap, had used many thousand International Harvester triple-baffle caps on its tractors without incident.

Defendant presented several witnesses to the events surrounding plaintiff's injury. Plaintiff was called under section 60 and stated that "regular" fuel was used but that neither plaintiff, his wife, who did the record-keeping, nor their fuel supplier could state whether plaintiff's most recent purchases had been of winter- or summer-grade fuel. The mechanics who repaired plaintiff's damaged tractor after the fire in question had poor recollections of their work. Although they remembered that the vehicle had been badly burned, especially near the area of the operator's seat, they could not remember the condition of specific parts.

Defendant offered the testimony of an emergency room technician who aided in plaintiff's treatment. The technician indicated that plaintiff had stated that he had been doing something with the tractor at the time of the explosion but that he could not remember what it was plaintiff said he had been doing.

Defendant offered the testimony of several witnesses who had knowledge concerning some of the other accidents involving fuel-geysering which plaintiff had introduced into evidence. Joseph Vineyard testified that at the time of the Gauges' tractor fire he had been in a field approximately one-half to three-fourths of a mile from the scene of the fire. He stated that the tractor had stalled just prior to the fire, and that at the time of the fire Mr. Gauges was using a comforter to cover the tractor, and that he knew from personal experience with the same tractor that

pressure problems occurred whenever the cover blocked the vent-hole of the fuel cap. Harold McEvers, the owner of the tractor Gauges was using, testified that although he had not himself witnessed the comforter cover blocking the vent hole, his workers had complained to him that it had done so.

A local International Harvester dealer who had examined the Gauges tractor shortly after that fire stated that he found nothing to suggest a mechanical problem with the tractor. This testimony was in part corroborated by the claims adjuster for McEvers' insurance company, who stated that the gas cap, which he had photographed, appeared to have only a slight paint discoloration and was otherwise undamaged.

Defendant called George Mehling, fire marshal in charge of the Greathouse fire investigation, who related that during his investigation he had found a poorly connected muffler and blistered paint, which indicated a vapor rather than a liquid burn. In his opinion a faulty muffler assembly had prevented heat from leaving the area of the engine, and this heat had increased fuel pressure to such a degree that when Mr. Greathouse removed the fuel cap the faulty exhaust could easily have ignited a strong outpouring of vapor.

Following the testimony of these witnesses defendant again called William Borghoff, whose expert testimony concluded the evidence for the defense. Borghoff testified that in reviewing the Gauges fire he had seen the black and white photographs the insurance adjuster had taken of the fuel cap and agreed with their assessment that the cap was largely undamaged. He also testified that certain statements made by Gauges during his testimony were contradictory. Borghoff said that Gauges' statement that after he had lifted the comforter off the fuel cap there was an inrush of air was a scientific contradiction of Gauges' further statement that immediately thereafter a pressure build-up blew off the fuel cap. Borghoff said that after having heard the other evidence in the case he believed that an inrush of air was more likely than increased pressure for two reasons. First, the tractor was being used at only 25 percent of its maximum load capability, and, second and more importantly, the pictures showed that the gasket of the fuel cap had not been pushed into the cap as pressure would have done. In Borghoff's opinion, the Gauges fire was caused by fuel spilling onto a faulty muffler after Mr. Gauges had removed the cap while moving over bumpy ground.

In testifying about the Greathouse tractor fire, Borghoff stated that an expert would certainly have to consider the testimony of the investigating fire marshal even though plaintiff's expert Sapetta had failed to do so. Based upon the fire marshal's testimony, Borghoff was of the opinion that the Greathouse tractor had no defect at the time it left defendant's control. Further, Borghoff's assessment of the physical damage done to

the Greathouse tractor led him to believe that a fuel spill caused the Greathouse fire and that geysering did not occur there and could not occur except under the most abnormal conditions.

The defense then rested. Plaintiff was called to the stand on rebuttal, but no question was asked of him. Instead, instructed by counsel, he removed his shirt and the jury was allowed to view the burn scars on his back.

Following the presentation of all the evidence the court allowed counsel to present motions outside the presence of the jury. Defendant moved to strike all evidence concerning fraud in the discovery process and moved to strike portions of the complaint charging wilful injury and defective design, the latter motion being based upon the assertion that no feasible design alternative had been offered. In denying defendant's motions, the court stated that even though it had doubts about plaintiff's case, there was nevertheless enough evidence to permit the case to go to the jury. Plaintiff was then allowed, over objection, to amend the complaint to state an alternative allegation that the cap blew off or was removed and that defendant negligently failed to give adequate warnings not to remove the fuel cap when the engine was still hot.

Plaintiff's counsel began his closing argument by emphasizing that plaintiff's story had remained constant from the time he first told medical personnel what happened and that his testimony was strongly corroborated by other farmers, many of whom never sued defendant and had no motive to fabricate stories about similar occurrences. In contrast, plaintiff said, defendant offered only the testimony of its own employees, who had jobs to protect and who even admitted having experienced similar problems with earlier models of defendant's tractors and having long been aware of the special hazards posed by use of winter-grade fuel in warm weather. After reminding the jury in vivid terms of the ghastly appearances of three burn victims, plaintiff's counsel addressed the jury concerning punitive damages. He told them that $1,000,000 might seem like a lot of money to them, but that represented only one-half of one percent of defendant's profits and only 1/2000 of defendant's net worth. Therefore, plaintiff's counsel argued, only a large punitive damages award would be sufficient to enrage stockholders of the defendant company and force a change of attitude. At the conclusion of plaintiff's argument defendant moved for a mistrial on the basis of several statements made by counsel but not supported by the record. Defendant characterized the argument of plaintiff's counsel in its brief as follows:

> "The closing argument of plaintiff's counsel included so much misconduct that it could serve as the judicial definition of the word. It contained manufactured evidence, misstated evidence, references to irrelevant evidence, argument of false issues, state-

ments of counsel's personal beliefs, fictional statements of irrelevant law and flagrant appeals to the passions of the jury."

Although the court agreed with defendant that plaintiff's counsel should not have implied that defendant had been told by actuaries that it is cheaper to injure people and pay damages than to manufacture safe products, it denied the motion because defendant had not raised objections during plaintiff's argument.

Defense counsel's closing argument asked the jury to decide the case on its facts and not on the prejudices inflicted upon them by plaintiff's action in parading before them a witness who was hideously burned from an unrelated event 16 years before. Defense counsel also attacked plaintiff's expert, "Lee Sapetta, B.S., Ph.D.," by saying that the "B.S." was rather appropriate since Sapetta had admitted to testifying in all kinds of cases, including one involving railroad couplers, but when asked about differences in various kinds of couplers Sapetta had been unable to answer. He characterized Sapetta as an expert only at evading the truth.

After the reading of the instructions the jury retired. A few hours later, in the presence of both counsel, the court stated that the jury had told the bailiff that they wished to be advised as to who would receive any award of punitive damages. Defense counsel suggested that this was the final showing that prejudice had occurred and asked that a mistrial be declared. Plaintiff's counsel stated that since many legal scholars, including an unnamed appellate court judge, have suggested that such awards go to the National Safety Council, there is an uncertainty in the law and that accordingly, no answer should be given to the jury's question. Defense counsel then suggested that the jury be instructed that plaintiff receives all damages, including any punitive ones. The court then ruled that no clarification would be made to its previous instruction, which stated that plaintiff could be awarded punitive damages if malice were shown on defendant's part. After further deliberations the jury returned verdicts of $650,000 in compensatory damages and $15 million in punitive damages.

It developed that without the instruction or knowledge of the trial court or counsel for either party, the bailiff had left the jury to deliberate in the courtroom rather than in one of the regular rooms provided for that purpose. Following rendition of the verdict, defense counsel asked the court if the files of plaintiff's counsel had been removed from the courtroom while the jury deliberated there. The court said it did not know, but the court clerk stated that much of plaintiff's files had been left in the courtroom during the jury deliberations. Defense counsel then asked permission to poll the jury individually about this, but his request was denied. However, plaintiff's counsel was directed to leave his files with the court for 10 days for inspection by defense counsel. Before the

hearing was concluded, plaintiff's counsel called the bailiff, who testified that he had put boards over the materials left by plaintiff's counsel before he left the jury to deliberate but that the jury had moved the boards during deliberations.

Following the trial several lengthy post-trial hearings were conducted. At those hearings defendant moved for both a new trial and for judgment notwithstanding the verdict by citing to several purported trial errors. Defendant also attempted to show that the jury's deliberations were contaminated by the presence of plaintiff's files. Plaintiff's attorney, when called as a witness by defendant, stated that upon returning from lunch an attorney with whom he shared office space told him that the jury was deliberating in the courtroom and asked him if all his files had been removed. Realizing that some files had been left in the courtroom, plaintiff's counsel stated that both he and the attorney alerting him to the problem looked for opposing counsel and for the presiding judge, but learned that both were still at lunch. Plaintiff's counsel then notified Chief Circuit Judge Cunningham, who in turn called the bailiff, who told them that on the advice of a senior bailiff he had let the jury use the courtroom to deliberate. However, the bailiff led court and counsel to believe that the files had first been secured. Plaintiff's counsel stated he did not worry about the matter again until he returned to court and discovered that the bailiff's idea of securing files was merely placing boards over them which the jury could remove. The testimony of plaintiff's counsel was corroborated by the bailiff and by Chief Judge Cunningham as well as by the attorney notifying him of the problem. Defendant called several of the jurors as witnesses, and although they had no recollection of specific events, several of them believed that other jurors had examined portions of plaintiff's file as well as the court's file, which had been left on the judge's bench. At the conclusion of these hearings the trial court denied all of defendant's motions except that with respect to the punitive damages, reducing them with a remittitur of 50 percent to $7,500,000.

Defendant's venue argument centers on whether it can be said to be "doing business" within St. Clair County for purposes of the Illinois venue statute. Section 5 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 5) provides that every action must be commenced in the county of the defendant's residence or in the county where the cause of action arose. Section 6 of the Civil Practice Act defines the residence of a corporation for purposes of venue:

"Any private corporation * * * organized under the laws of this State, and any foreign corporation authorized to transact business in this State is a resident of any county in which it has its registered office or other office or is doing business." Ill. Rev. Stat. 1979, ch. 110, par. 6(1).

Because the accident which is the subject of this suit occurred in Brown County where plaintiff resides, defendant's residence will be determinative of the question of the propriety of venue in St. Clair County. Defendant is a Delaware corporation authorized to do business in Illinois with its registered office and headquarters in Chicago. Although defendant has plants of other principal facilities in DuPage, Rock Island, Lake, Fulton, Peoria and Sangamon counties, it maintains no offices in St. Clair County. Thus, venue will lie in St. Clair County only if it can be demonstrated that defendant is "doing business" in the county within the meaning of section 6 of the Civil Practice Act.

■■ Defendant asserts that its relationship with St. Clair County does not meet the standard of "doing business" set forth by the supreme court in *Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 368 N.E.2d 88. The court in that case stated:

> "[I]n order to establish that a defendant is doing business within a county for purposes of venue, * * * [it must be shown that defendant is] conducting its usual and customary business within the county in which venue is sought. * * * '[T]he activity must be of such a nature so as to localize the business and make it an operation within the [county].' [Citation.]" (67 Ill. 2d 321, 329-30, 368 N.E.2d 88, 92.)

The *Mosele* court concluded that the defendant railroad was not doing business within Madison County for venue purposes when its trains only occasionally entered the county to be switched with trains under the control of another railroad and its sales representatives came to the county only on an irregular and nonscheduled basis.

The factual situation in the case at bar differs greatly from that considered by the court in *Mosele*. Here, the record indicates that there are five independent retail dealers in St. Clair County who sell defendant's products. Gross sales of defendant's products to these St. Clair County dealers totalled $2.6 million for the year 1976-77. Defendant employs various field representatives who visit the dealers regularly to provide a wide range of assistance and service, and defendant also reimburses the dealers for half of their advertising costs. In addition, defendant finances the sale of equipment to the dealers through its wholly owned subsidiary, International Harvester Credit Corporation. While defendant maintains that the activities in St. Clair County of its subsidiary corporation have no bearing on its own activities there, the relationship between the dealers and the Credit Corporation is controlled by the dealers' contracts with defendant. We believe these facts amply establish an ongoing and continuous relationship between defendant and its authorized St. Clair County dealers, and we accordingly hold that the trial court

was correct in finding that defendant was "doing business" in St. Clair County for purposes of the venue statute.

The supreme court's consideration of these same venue facts in the case of *International Harvester Co. v. Goldenhersh* (1981), 86 Ill. 2d 366, 427 N.E.2d 158, provides further support for this finding. The court there considered an original action in mandamus brought by International Harvester after its motion for change of venue in two other cases pending in St. Clair County were denied by the trial court. In ruling that *mandamus* will lie only when a trial judge refuses to perform a clearly defined duty, the court recognized that International Harvester had activities with retail dealers in St. Clair County and stated that this was "not a case where [International Harvester's] right to a change of venue * * * is clear." (86 Ill. 2d 366, 373, 427 N.E.2d 158, 162.) Similarly, in this appeal we find that defendant's activities in St. Clair County are sufficient to fix venue and that the trial court's denial of defendant's motion to transfer did not constitute an abuse of discretion. We do not address the issue of whether a change of venue was necessary in view of local publicity concerning the Gauges settlement since defendant has not raised this issue on appeal.

■■ Defendant's next contention is that plaintiff's statement that the fuel cap was securely fastened prior to the geysering and fire constitutes a binding judicial admission. Since all the experts, including those of the plaintiff, agreed that a securely fastened cap could not blow off, the defendant contends there was insufficient evidence of liability to raise a jury question.

Even if we assume for argument's sake that plaintiff's statement was a judicial admission, this does not mean that plaintiff failed to furnish proof of his cause of action, as defendant contends. Although the experts seemed to agree that it was an "impossibility" for a securely fastened triple-baffle cap to be blown off, they were nevertheless contradicted by several farmers who categorically stated that this "impossibility" had in fact happened to them. In view of this testimony from farmers which contradicted the testimony of the experts, it cannot be said that the plaintiff's statement constituted a judicial admission, as one of the premises for the declaration that plaintiff's statement was a judicial admission is absent. At the very least the evidence created a question for the jury to resolve. Our holding is in conformity with other decisions because it is well recognized that

> "[A] party may, by his own testimony, conclusively bar his claim or his defense. But a determination that he has done so depends upon an evaluation of all of his testimony, and not just a part of it. It depends, too, upon an appraisal of his testimony in the light of

the testimony of other witnesses and a consideration of their respective opportunities to observe the facts about which they testify." *Pizano v. Trejo* (1971), 2 Ill. App. 3d 944, 947, 274 N.E.2d 861, 864.

■■ The evidence furnished by farmers regarding geysering and fires on other tractors, some similar and others somewhat dissimilar, was properly admitted for the purpose of disproving the expert testimony regarding the integrity of the tightened fuel cap. Evidence of other sufficiently related accidents, although not competent for the purpose of showing independent acts of negligence, may be admissible to show notice to defendant that conditions were unsafe and that unsafe conditions caused other accidents. Defendant had denied that a fuel geyser could occur in any tractor with a configuration similar to plaintiff's model 706 except under the most extreme circumstances. Additionally, defendant asserted that it was impossible for a securely fastened triple-baffle cap to be blown off under any circumstances. Whether such evidence of other accidents is admissible is a matter for the exercise of sound discretion by the trial judge. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9; *Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 409 N.E.2d 299.) "It need not be shown that the accidents occurred in an identical manner," the supreme court said in *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538; "[s]ubstantial similarity is all that is required."

■■ Defendant's arguments asserting that the trial court committed reversible error in permitting the plaintiff to amend his complaint, alleging liability for failure to give adequate warning, and in giving instructions to the jury based upon the amendment, are related to some extent to the attack upon the admission of other accidents. The charge is that the evidence of the other accidents was used to bridge the gap in the evidence necessary to support the amendment and the instructions.

We disagree with defendant's arguments which address these points and find that the trial court did not abuse its discretion in permitting the amendment and giving instructions based thereon. The amendment to the complaint became the fifth allegation of an unsafe ·condition of the tractor:

"(E) That the defendant failed to warn users that failure to fully engage the cap, or that removal of the cap when pressure was built up in the tank, might cause the cap to blow off, and a spewing or geysering of gasoline might occur."

The other four defects that were alleged were:

"(A) The gasoline tank was located too close to heat sources so that it was exposed to excessive heat and pressure which caused gasoline to geyser or spew from its tank.

(B) The gasoline tank was not adequately vented.

(C) The gasoline tank was not adequately shielded or insulated from engine and exhaust heat sources.

(D) The defendant failed to adequately warn users of the tractor that the use of winter-grade fuel in warm weather could cause gasoline to erupt or geyser from its gasoline tank."

We find the condition added by (E) to be closely related to charge (D), so much so that defendant suffered neither prejudice nor surprise by the addition of (E). Moreover, there was evidence in addition to that of the other occurrences that could justify the amendments and the attendant instructions.

It is our appraisal that there is little concrete evidence of either discovery fraud or of an ongoing conspiracy designed to keep information from victims of fuel fire. Nonetheless we are compelled to agree with the trial court's determination that even though there were doubts about whether discovery fraud and concealment had been shown, there was enough evidence for the jury to make that determination rather than the court. Although defendant offered an explanation for each allegation of concealment, the jury was entitled to hear the explanations and judge their reasonableness. This is especially true here since many of the alleged instances involved discovery in the Gauges case and, by prior orders and agreements, discovery in that case was to be used in this case. Borghoff's explanation of his deposition answers during Gauges discovery raised a classic question of credibility which would be for a jury to resolve. Even though Borghoff was asked what other cases involved allegations of geysering, he failed to list the Greathouse case even though he was working on it at that time. Borghoff's explanation was that he was thinking only of farm tractors, rather than general purpose tractors, when he answered the question. When this is coupled with the limited answer given during the Greathouse deposition, and the failure by defendant to discover that its Chicago counsel had records in three locations, a sufficient question was raised for resolution by the jury.

■■ Defendant argues that even if evidence of other occurrences was admissible for limited purposes, it was nonetheless improper and highly prejudicial to have hideously deformed burn victims testify in person about unrelated occurrences. There is a firm basis in the record for defendant's argument. We agree that it would have been better had these victims not testified in person, but in view of the fact that their testimony was probative of the issue of causation by showing that such phenomena do in fact occur, we are unprepared to state that reversible error occurred by their in-court appearance, especially when no questions concerning the extent of their injuries were permitted.

■■ However, despite the court's care to see that the extent of the

witnesses' injuries was not discussed, plaintiff's counsel improperly used their appearance as the basis for inflammatory and prejudicial statements during closing argument. He vividly reminded the jury of Buatt by describing him as a man "[w]ho was just burned to—his ears were gone, his lips were pussy and puffy, he limped in here. And he obviously just sustained one of the worst burns anybody ever saw." The extent to which these witnesses prejudiced the jury cannot be measured, but the fact that prejudice did result from their unnecessary in-court appearances cannot be denied. When the statements made by plaintiff's counsel during closing argument about the physical appearance of these witnesses are coupled with completely unsupported statements concerning defendant's use of actuaries to determine that injuring people would be cheaper than correcting defects, it cannot be disputed that serious error was committed during closing argument. Yet despite these glaring errors and despite the trial judge's statement that he looked at defense counsel "six or eight times during plaintiff's argument almost inviting objections," no objections were made until the jury had left the courtroom upon completion of plaintiff's closing argument. Only at that point did defense counsel move for a mistrial. In denying that motion the trial court stated:

"This Court looked at [defense counsel] at least six or eight times during plaintiff's argument almost inviting objections. Much of the argument was outside of the evidence * * * [and had] no business in this litigation. But it is your responsibility to give this court the opportunity to rule on these matters. In the interest of judicial administration and economy, I'm not going to waste seven weeks because you were reluctant to object early. If you would have done it early, we could have stopped it."

We are aware that a failure to object to closing argument does not waive the issue where the argument is so inflammatory and prejudicial as to cause a deterioration of the entire trial process. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 254 N.E.2d 453.) While the argument here approaches or transcends that level, we are mindful of the fact that the determination of whether argument not objected to was so pervasive as to deny a party a fair trial is a matter of sound trial court discretion, and that determination will not be disturbed on appeal absent a "clear abuse of that discretion." (*Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 844, 364 N.E.2d 660, 671.) We are persuaded, as was the trial court, that defendant was represented by experienced counsel who obviously and consciously chose not to object as a matter of trial strategy. To allow this deliberate and knowledgeable silence now to be used as a basis for reversing the verdict in this trial would, in our opinion, constitute a deterioration of the judicial process. The trial court could early have stopped the improper comments upon defendant's objection and admonished the jury of the impropriety; yet,

the trial court's stares to counsel inviting objection were met with silence. Defendant may not now use this silence to its advantage when it failed to act earlier when given an opportunity, or even an invitiation, to do so.

■■ Defendant objects to the deliberations of the jury for two reasons. Its first point is that the jury deliberations were contaminated by the presence of nonevidentiary materials in the room where deliberations were conducted. As detailed previously, this situation arose because of unauthorized and apparently unprecedented actions taken by an inexperienced bailiff. The general prohibition against allowing a jury to impeach its own verdict is well recognized and accounts for decisions which have reversed jury verdicts where unauthorized evidence was accessible to the jury, even in the absence of a showing of consequent improper influence. (See *Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 386 N.E.2d 134.) The logic of such decisions is well stated in *Gertz v. Bass* (1965), 59 Ill. App. 2d 180, 208 N.E.2d 113. In that case, involving the automobile guest statute, the bailiff gave the deliberating jury a dictionary containing the definition of the words "wilful and wanton." In explaining its order of reversal the court stated:

> " 'When incompetent evidence which may be prejudicial is received, the verdict is set aside, without proof that the jury gave it any weight in reaching the verdict. To require the losing party to prove actual prejudice would place a difficult and unjust burden on him.' " (59 Ill. App. 2d 180, 185-86, 208 N.E.2d 113, 116.)

Although defendant has cited many cases in conformity with *Heaver* and *Gertz* we believe that the case at bar is distinguishable for one important reason. In apparent realization of both the time involved in this trial and the potential for error, plaintiff's counsel did not raise customary objections about a jury's impeaching its own verdict when defendant called many of the jurors as post-trial witnesses. In effect, plaintiff consented to full inquiry and investigation of the deliberative process of the jury to determine whether any taint or undue influence had occurred. Because of the very broad latitude which this unusual opportunity afforded defendant, defendant was not confronted with the "difficult and unjust burden" alluded to in *Gertz*. For that reason we believe that defendant is bound by the post-trial record it created. Since that record does not establish that the jurors used or were in any way influenced by improper and prejudicial materials, we do not find a basis for reversal.

■■ Defendant also contends that jury deliberations were tainted by the trial court's refusal to answer the jury's inquiry as to who would receive any award of punitive damages. The court's failure to clarify this question is alleged to have contributed to the excessive punitive damages award, which the trial court halved. Nonetheless, the court's response, that it could not clarify its previous instruction, left standing its previous reading

of Illinois Pattern Jury Instruction, Civil, No. 35.01 (2d ed. 1971), which stated that in addition to compensatory damages the jury could "award plaintiff" punitive damages *if wilful and wanton conduct by defendant warranted punishment.* This was an entirely proper statement of the law and will not serve as a basis for reversal.

■■ Defendant's final contention is that both compensatory and punitive damage . awards were excessive. Defendant argues that the $650,000 award of compensatory damages could only have been the result of passion and prejudice since his total medical bills were under $8,000 and he recovered with only conservative treatment, which did not require skin grafts. Plaintiff was asked to remove his shirt for jury observation because the full extent of scarring could not be readily observed from pictures. Undoubtedly plaintiff was not nearly as hideously disfigured as the other victims of geysering fires who had been called as witnesses. Nonetheless, there was evidence to show that second-degree burns such as those suffered by plaintiff are very painful, as opposed to the more severe but less painful third-degree burns in which nerves are destroyed. In addition to the pain, defendant's slowness in returning to work and his subsequent stroke, which a doctor considered related to the accident, were factors for the jury to consider. Although their compensatory verdict approached the outer limits of a permissible verdict we are not prepared to hold it excessive as a matter of law.

We are unable to agree with defendant's claim that it was entitled to a directed verdict on the propriety of awarding plaintiff punitive damages. In *Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, we recently addressed the issue of the nature of wilful and wanton conduct that would justify an award of punitive damages. We said that it occurs when a person with a known duty to ensure the safety of another exhibits a conscious indifference to that duty. (Accord, *Bartolucci v. Falleti* (1943), 382 Ill. 168, 46 N.E.2d 980.) In this case there was evidence that defendant's own personnel were alerted to potential problems with the 1/16-inch vent-hole, and this evidence was sufficient to raise a jury question as to whether defendant exhibited a conscious indifference to its duty toward users of its tractors. When this evidence is coupled with that concerning discovery fraud, which was as we stated previously, just enough to go to the jury, we believe that a jury could properly find that punitive damages were warranted.

As we noted in the recital of the facts, the jury returned a verdict of $15,000,000 as punitive damages. Describing it as "shocking to the conscience," the trial court directed a remittitur to $7,500,000. Defendant attacks the $7,500,000 judgment for punitive damages as being grossly and flagrantly excessive, the result of passion and prejudice inflicted upon

the jury by the conduct of plaintiff's counsel in the presentation of plaintiff's case.

There is no need to discuss further the alleged trial misconduct of plaintiff's attorney. Nor, for that matter, is there any need to search for the reason behind a $15,000,000 verdict and a $7,500,000 judgment for punitive damages. It is sufficient that we consider them in the light of the guidelines established by our supreme court. We think it relevant to note, however, that the verdict for punitive damages returned by the jury was over 23 times the amount of the verdict for compensatory damages and that the judgment for punitive damages was over 11 times the amount of compensatory damages.

The supreme court guidelines to which we refer are contained in *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509, and *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. These cases contain a discussion of the history, purpose and law regarding the imposition of punitive damages, and the already undue length of this opinion makes it sufficient for our purposes to incorporate the rules of *Mattyasovszky* and *Kelsay* by their citation. Application of the guidelines of these cases to the case at bar involves consideration of the factors of punishment, deterrence and profit with respect to the defendant and windfall with respect to the plaintiff. For reasons not applicable in this case, awards of punitive damage were set aside in both *Mattyasovszky* and *Kelsay*.

■■ The plaintiff argued strenuously to the jury that defendant had profited by its knowing use of a defective product, the fuel cap. Evidence from defendant indicated concern with the problem and diligent efforts to correct it. In any event, it certainly cannot be said that all of whatever profits defendant had made and all of whatever assets it possessed at the time were attributable to its utilization of the design of the fuel tank assembly and the fuel cap involved in this case. What, then, is a proper judgment for punitive damages? Plaintiff was made whole for his injuries, out-of-pocket expenses, and pain and suffering by the compensatory verdict of $650,000. We think that the interest of the public will be served and that conduct analogous to that reflected in this case upon the part of defendant and others similarly situated will be deterred by an award of punitive damages which is equal to the amount of compensatory damages, $650,000. The award of punitive damages in an amount equal to the amount of compensatory damages should not be interpreted as a guideline for future cases or as an application of a formula. Each case must be considered in its own context in determining the entitlement to and the amount of punitive damages.

For the reasons stated the judgment for the plaintiff for compensa-

tory damages in the amount of $650,000 is affirmed; the judgment for the plaintiff for punitive damages in the amount of $7,500,000 is reduced to $650,000.

Judgment for compensatory damages affirmed; judgment for punitive damages reduced to $650,000.

HARRISON, J., concurs.

JUSTICE WELCH, concurring in part and dissenting in part:

As the majority correctly observes, several Illinois cases have set forth standards to determine whether punitive damages should be granted. (*Moore v. Remington Arms Co.* (1981), 100 Ill. App. 3d 1102, 427 N.E.2d 608; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353; *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509; *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.) However, neither the Illinois Supreme Court nor the General Assembly has provided any standard by which the amount of a punitive damage award may be judged. The majority's opinion also fails to establish meaningful rules for the guidance of other reviewing courts facing the same issue. It is concluded simply that $650,000 in punitive damages would be appropriate in this case.

Without knowing what guidelines were used to reach this conclusion, I am unable to agree with it. The jury originally awarded $15,000,000 in punitive damages, and the trial judge, who heard the evidence presented, reduced that award to $7,500,000. In the absence of a rationale or legal doctrine by which we, as a reviewing court, can characterize the action of the trial court as improper, I would treat the judgment as based upon that evidence and affirm the award of punitive damages as entered by the court.

In all other respects, I concur with the opinion of the majority.