ROBERT DEMPSEY *et al.*, Plaintiffs-Appellees, *v.* HOLIDAY UTILITIES CORPORATION, Defendant-Appellant.

Fifth District    No. 81-134

Opinion filed May 24, 1982.

WELCH, J., concurring in part and dissenting in part.

Wiseman, Shaikewitz, McGivern & Wahl, P. C., of Alton, for appellant.

Dennis A. Brandt, of Mateyka, Hill, Hill & Armstrong, of Granite City, for appellees.

JUSTICE KASSERMAN delivered the opinion of the court:

After a bench trial in the circuit court of Madison County, the court granted plaintiff homeowners' petition for permanent injunction against

defendant water company and awarded plaintiffs money damages, including punitive damages and attorney fees. The following facts appear from the pleadings, exhibits, and the testimony adduced at the trial on February 29 and April 2, 1980: Plaintiffs, Robert and Becky Dempsey, purchased Lot 1880 in Holiday Shores subdivision in Madison County, Illinois, in April 1978 and began construction of a new house on that lot the following month. At the time of the purchase, a water meter and a "yard hydrant" had been installed on the lot. The hydrant was not a fireplug; instead, it was a faucet or spigot to which a garden hose could be fitted. According to the plaintiffs, the hydrant was locked when they purchased the lot. Dan Smith, president and chief operating officer of defendant, Holiday Utilities Corporation, testified that the hydrant was private property and that the lock was not defendant's. Defendant, which had been owned by the Dan Smith Company since 1977, had provided water service to the entire subdivision since 1967. In July of 1978, prior to completion of the house on Lot 1880, defendant billed plaintiffs for $12.50 for the quarterly billing period ending June 30, 1980, and for $368.75 for a previous unpaid bill. As of July 25, the due date of this bill, no portion of it had been paid. Plaintiffs' attorney wrote defendant on August 14, 1978, inquiring as to why this bill had been sent and demanding that defendant not deny plaintiffs water service when plaintiffs did apply for such service. Mr. Smith replied by letter dated August 16, 1978, that the lot was served by a yard hydrant; that the recorded utility covenant for the subdivision provided for a $12.50 minimum charge per quarter for "water availability"; that such charge was binding upon the purchaser and his heirs and assigns; and that the lot owner must pay for the service or face a lien against the property, enforceable by foreclosure.

According to Mr. Dempsey, he became aware in August 1978 that there was no water service at the house. The house was completed, except for water service, near the end of September 1978. Mr. Dempsey related that he went to defendant's office in the subdivision where Tom Albrecht gave him an application. Mr. Dempsey completed it and returned it to Albrecht, who said that everything appeared to be in order and that it would probably be a week before water was hooked up at the house. Albrecht also stated that the application would have to go to St. Louis for approval. Mr. Dempsey tendered no payment with the application.

Mr. Smith testified that the only office defendant maintained in the subdivision was for the use of defendant's water treatment operator and that it was not an office for customer service or contact. Defendant's office for those purposes was in St. Louis. Albrecht was a supervised maintenance man who worked briefly for defendant and had no responsibility for customer service, applications, or collections. Defendant's records did not indicate an application by Mr. Dempsey in August.

By letter to defendant dated September 13, 1978, plaintiffs' attorney agreed that plaintiffs were responsible for the $12.50 quarterly minimum charge from the date of plaintiffs' purchase of the lot but disclaimed responsibility for the unpaid charges of $368.75 incurred prior to the purchase. In the letter, plaintiffs' attorney also sought assurance that upon proper application and payment of currently due quarterly use charges, water would be supplied. There is no indication of a response by defendant to this letter.

On September 28, Mr. Dempsey spoke to Mr. Smith at Mr. Smith's house. According to Mr. Dempsey, Mr. Smith told him that until the last bill was paid, plaintiffs would not receive water. Mr. Smith testified that he might have so stated. Mr. Dempsey testified that he told Mr. Smith that he would pay any bill plaintiffs had incurred since they had owned the lot but not the prior owner's bill. Mr. Smith testified that Mr. Dempsey did not tender an application or offer to pay any portion of the previous bill.

By letter to defendant dated October 2, 1978, the Consumer Assistance Office of the Illinois Commerce Commission stated that plaintiffs had agreed to pay all charges accrued since their ownership of Lot 1880 and observed that, under Illinois Commerce Commission General Order 172, service could not be denied based on a previous owner's bill. The letter requested that plaintiffs be provided water service. By letter dated October 6, defendant replied that the balance due under the recorded water covenant for the subdivision was $382.50 as of July 25, 1978, and noted that plaintiffs' deed stated that it was subject to all covenants and restrictions of record. By letter to defendant dated October 9, 1978, plaintiffs' attorney again demanded water service for plaintiffs.

Plaintiffs' complaint for injunction, damages, and attorney fees was filed October 18, 1978. Their petition for a temporary restraining order or preliminary injunction to prevent defendant from refusing water service until a hearing could be had on the complaint for permanent injunction was filed October 19, 1978. Plaintiffs had been billed on October 9, 1978, for $382.50 previous balance plus $12.50 for the quarter ending September 30; no portion of that bill was paid as of its due date of October 25. On October 26, 1978, a "Temporary Restraining Order" was entered which stated in part: "Defense counsel agrees on behalf of the Defendant that upon application and payment of undisputed bills, water service will be provided. Plaintiffs agree to do so. This case, therefore, continued by agreement." On October 29, Mr. Dempsey went to defendant's attorney's office, wrote out an application form and paid $25. Water service was hooked up the same day.

In order No. 58638, dated December 6, 1978, the Illinois Commerce Commission announced various findings and conclusions relating to the billing practices of defendant as determined in hearings before the

Commission in March and May of 1978 and at various other hearings since 1973. The order, in pertinent part, provided as follows:

"Respondent [defendant] claims that the purchase contracts for lots within its certificated area, the tariffs on file with the Commission and the record in the original certificate proceeding each recognized the collection by Respondent of an available for use charge. Contending that it is authorized to collect an available for use charge from its non-metered customers, including both those customers with applications and those customers without applications on file with the Company, Respondent commenced to bill all lot owners for water service in its certificated area.

Since April, 1977, the Consumer Assistance Section of the Commission has received numerous complaints concerning the Company's billing practices. These complaints include, inter alia, the practice of (1) billing lot owners who never signed an application for water, (2) demanding that present customers pay delinquent water charges incurred by their predecessors in title, and * * *. The Company supports [its] position stating that certain covenants dealing with the Holiday Shores Subdivision were made a part of the sale contract when lots in the subdivision were purchased and provide in part 'the purchaser contracts and agrees to pay a minimum water use charge not to exceed $12.50 per quarter and/or such water use charges as may be set and/or approved by the Illinois Commerce Commission.' Respondent claims that such a covenant runs with the real estate and is binding upon grantees of the original purchaser.

* * *

The Commission is of the opinion that the record of the original certificate proceeding does not authorize or otherwise allow Respondent to collect an available for use charge, in fact, it appears abundantly clear to this Commission that Respondent's witness in the certificate proceeding and its witness in this proceeding prior to its being reopened, intended that only those lot owners who applied for service would be billed.

* * *

[U]nder Respondent's tariffs it is authorized to charge only those individuals who have signed applications for water service or are otherwise receiving water service from the Company.

* * *

[Conclusions:]

* * *

(11) Respondent's tariffs only authorize it to charge customers who have applied for water service, and the practice of Respondent to

demand a charge of $12.50 from lot owners who have not signed a water application is unjust, unreasonable and contrary to the tariffs on file with this Commission;

(12) Respondent had no authority under its tariffs or the rules and regulations of this Commission to deny water service to a new customer because the prior owners of the property had not paid water bills and such practice of Respondent is unjust, unreasonable and contrary to its filed tariffs;

\* \* \*

IT IS THEREFORE ORDERED by the Illinois Commerce Commission that Holiday Utilities Corporation immediately cease, desist and refrain from charging, collecting or demanding payments from customers not authorized by its tariffs as set forth in Findings (11), (12), (13) and (14) hereof \* \* \*."

Mr. Smith testified that as of the time of trial, order No. 58638 was being appealed in the circuit court of Madison County. He explained that defendant had taken the position that, in view of the subdivision's water utility covenants, a contract to purchase a lot within the subdivision constituted an application for water service. Defendant viewed order No. 58638 as affecting only "nonusers" who had not applied for water service and were nonetheless being billed. According to Mr. Smith, a customer was billed at the end of a quarter for his water use in that quarter. In general, no deposit was necessary when a new customer applied for service, even if the application was in mid-quarter; *i.e.*, a new customer owed nothing until the end of the quarter. Defendant's rate schedule, admitted in evidence, indicates that the first billing shall be on the first quarterly billing date after application.

Mr. Smith testified that company records revealed that plaintiffs or their agents called on May 7, 1978, to report a water leak on Lot 1880; that defendant's employees investigated and discovered a leak between the meter box and the yard hydrant; and that the employees closed the meter valve and advised the owner to make repairs. Defendant's exhibit No. 6, in evidence at trial, was a document entitled "Customer Complaints and Service Report." It bore the same information. There was no affirmative indication thereon that the needed repair had been made or service restored. Mr. Smith explained that it was the customer's responsibility to repair any leak on the customer's side of the meter. According to Mr. Smith, "[s]ervice is restored by checking to see if the repair has been made. And if the repair has been made, then we open the valve and turn the water on." A customer could turn the water on with pliers or a crescent wrench. For a customer to get water in the house, the customer would need to extend the pipe from the meter. Keeping the yard hydrant

was optional. Although customers often turned their water supply off or on, Mr. Smith stated that "we don't like" them to do so. Defendant's regulations required that the customer notify defendant of a change of lot ownership, make written application, and "arrange for service to be turned on if it's not already turned on." Mr. Smith testified that he was unaware whether the water was shut off at the meter valve at the time plaintiffs were seeking water service.

Defendant's exhibit No. 17 consisted of payment stubs for plaintiffs' water service for payments due in January, April, July, and October of 1979 and January of 1980. The "net amount due" on each of these stubs except for the last one reflected a billing for the arrearage of the prior owner of Lot 1880. Each of plaintiffs' payments was for the current amount due only.

Mr. Dempsey testified regarding various inconveniences his family suffered because they could not move into their new home prior to October 29 because of the lack of water service. He itemized resultant expenses of $195. At the conclusion of trial, the trial court granted a permanent injunction prohibiting defendant from billing plaintiffs for the prior owner's past due bill and from refusing water service on that basis. The court found damages as follows: Actual damages $220 (apparently, $195 plus the $25 plaintiffs paid on October 29, 1978); punitive damages, $3,500; and attorney fees, $2,765. The trial court also denied defendant's counterclaim for the prior owner's arrearage.

In this appeal defendant urges that various findings by the trial court were against the manifest weight of the evidence. Defendant also argues that punitive damages were improperly awarded and that, if this was a proper case for punitive damages, the amount awarded was excessive. Neither the question of the propriety of the award of attorney fees assessed in the trial court nor the reasonableness of such award has been briefed or argued in this appeal and will not be considered by this court. (See 73 Ill. 2d R. 341(e)(7).) Further, this court ordered that plaintiffs' motion for attorney fees on appeal, filed in this court after the appeal was perfected, be considered with this appeal.

Defendant contends that the trial court erred in finding that defendant unreasonably and unlawfully refused to provide water service to plaintiffs prior to October 29, 1978. Defendant urges that water service was available when plaintiffs purchased the lot because it was serviced by the yard hydrant; that the leak reported May 7, 1978, indicates that available water was leaking; and that plaintiffs admitted that they had available water service by offering to pay undisputed charges in inquiries about the water service and by agreeing to pay a $25 "undisputed bill" as shown by the "Temporary Restraining Order" of October 26, 1978. Plaintiffs argue that the leak report, which reflects that water was shut off

May 7, is not inconsistent with defendant's refusal to turn on the water from August 1978, until October 29, 1978.

In our view, the decisive facts are that plaintiffs could not obtain water in their house at any time from August 1978 until October 29, 1978, when defendant effected a "hookup." This was uncontradicted and was ample proof of plaintiffs' lack of water service prior to the hookup.

However, we agree with defendant that plaintiffs admitted their liability for $25 for two quarters' minimum water charge from April 1, 1978, to September 30, 1978; for that reason it is unnecessary that we decide whether that $25 was in fact owed by plaintiffs. Defendant urges that such admission is evidenced by plaintiffs' various offers to pay the minimum use charge for the time they owned the lot but had no water service and plaintiffs' agreement to pay $25 as the "undisputed" portion of the bill. We find the point conceded as well during Mr. Dempsey's testimony on cross-examination: Mr. Dempsey testified that the yard hydrant was ultimately removed before the house was completed. When defense counsel asked Mr. Dempsey whether, to his knowledge, any of the contractors used the hydrant during construction prior to its removal, plaintiffs' counsel objected, arguing that "there is no question about the fees incurred or whether they were paid after the Dempseys bought the property at 1880. The question is the prior charge * * *." The court sustained this objection.

While we find that plaintiffs conceded that they owed the minimum water charge for the first two quarters of their ownership of Lot 1880, we do not agree with defendant's conclusion therefrom that plaintiffs conceded that they had water service for that period of time. It appears that plaintiffs believed, rightly or otherwise, that they owed the minimum use charge regardless of whether they had applied for water, as evidenced by their letters admitting liability for this charge while seeking water service, and from the agreed order of October 26, 1978, of like effect. Support for that belief appears in the recorded water covenant for the subdivision, which states in part: "The Purchaser contracts and agrees to pay a minimum water use charge not to exceed $12.50 per quarter * * *." We conclude that the trial court did not err in determining that plaintiffs were refused water service; however, we find that it was error to award plaintiffs as an element of their damages the $25 undisputed liability of plaintiffs for the billing period from April 1978 through September 1978.

Next, defendant argues that the trial court's finding that defendant unreasonably and unlawfully attempted to collect the prior owner's unpaid bill was against the manifest weight of the evidence. Defendant urges that plaintiffs failed to avail themselves of the dispute resolution procedures set forth in Illinois Commerce Commission General Order 172, Second Revised, and that refusal by defendant to provide service, if

any, was because of plaintiffs' failure to pay undisputed charges rather than the prior owner's bill. As we understand the second of these arguments, defendant is urging that plaintiffs would have been provided service had they paid the $25 coming due after they acquired their lot. This contention is untenable. Defendant consistently demanded full payment of the prior owner's bill as a prerequisite to any service, as shown by Mr. Smith's letters of August 16 and October 6, 1978, and by Mr. Dempsey's account of what Mr. Smith told him on September 28, 1978.

Additionally, in our view the Illinois Commerce Commission's dispute resolution procedure, relied upon by defendant, does not apply to the circumstances at bar. Section 16 of General Order 172, Second Revised, is entitled "Dispute Procedures." It requires a utility to assign at least one employee in each of its business offices to hear any dispute by an "applicant, customer or user." If the dispute cannot be resolved, the employee designated to hear disputes is to inform the complainant of the right to have the matter heard by supervisory personnel who, in the event of further inability to resolve the dispute, is to inform the "applicant, customer, or user" of the right to review by the Illinois Commerce Commission. That portion of the dispute procedures relied upon by defendant states that when a "customer" disputes a particular bill, the utility shall not discontinue service for nonpayment so long as the "customer" (1) pays the undisputed portion of the bill (subject to exceptions inapplicable here), (2) pays all future bills when due, and (3) begins bona fide dispute settlement discussions with the utility.

In the "definitions" section of General Order 172, Second Revised, "customer" is defined as "a person who has agreed with a utility to pay for gas, electric, water or sanitary sewer utility service." "Applicant" is defined as "a person who applies for residential or non-residential utility service." In the case at bar plaintiffs were at all relevant times attempting to secure first-time service, service which they did not have. No agreement to pay for service had been reached. We find that plaintiffs in these circumstances were applicants, not customers, and that the provisions relied upon by defendant were not applicable to plaintiffs. We further note that the provisions relied upon by defendant forbid "discontinuation" of service under certain conditions, an anomalous reference where the complainant has not yet received service.

Defendant also argues that plaintiffs failed to establish that any of the damages they claimed to have incurred after plaintiffs in fact received water service on October 29, 1978, resulted from continued billing by defendant for the unpaid bill of the prior owner. Defendant notes that plaintiffs did not pay any portion of the prior owner's bill and that all testimony regarding damages incurred by plaintiffs related to plaintiffs'

inability to get water service prior to October 29, 1978. We agree with defendant that, assuming continued billing for the prior owner's bill after October 29, 1978, was improper, there was no evidence of actual damages resulting from that billing. The damages proved resulted from defendant's refusal to provide water service prior to October 29, 1978, unless the prior owner's bill was paid. Nevertheless, we find ample basis in that refusal to justify the imposition of actual damages as set forth in section 73 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 77). Further, we conclude that the judgment of the trial court does not depend on a finding that some of plaintiffs' damages were incurred as a result of defendant's acts or omissions occurring after October 29, 1978.

Next, defendant contends that the trial court erred in finding, contrarily to the manifest weight of the evidence, that defendant "unreasonably and unlawfully violated the ICC Order entered December 6, 1978." Defendant urges that this order prohibited billing only the owners who had not applied for water service and were not "otherwise receiving" water service. However, this contention depends on the premise that plaintiffs were receiving water service prior to October 29, 1978, through the yard hydrant. We have already noted our inability to accept that premise. We conclude that the trial court's finding that the order of December 6, 1978, was violated by defendant's continued billing for the unpaid bills of the prior owner was supported by the evidence adduced.

The remaining issues concern the trial court's award of punitive damages of $3,500 to plaintiffs, pursuant to section 73 of the Public Utilities Act. Section 73 provides in part that where a public utility shall do any act prohibited or declared to be unlawful or shall omit to do any act required to be done by the provisions of the Public Utilities Act or any rule, regulation, order or decision of the Illinois Commerce Commission under authority of that act, the public utility shall be liable for damages and, if the court finds that the act or omission was "wilful," the court may award punitive damages in addition to actual damages. (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 77.) Defendant contends that the case at bar was not a proper case for imposition of exemplary or punitive damages because there was insufficient basis upon which to characterize defendant's behavior as wilful. Defendant urges that it has consistently attempted to justify its conduct with respect to plaintiffs and that the imposition of punitive damages in the instant case would force utilities to construe their rate schedules, Illinois Commerce Commission orders, and statutes most favorably to consumers. Defendant also argues that the amount of punitive damages assessed was excessive.

■▮ ■ Although punitive damages may be recovered in a proper case, they are not a favorite in the law and will be allowed with caution and confined within narrow limits. (*Smith v. Dunaway* (1966), 77 Ill. App. 2d

1, 221 N.E.2d 665.) It is generally recognized that punitive damages are awarded primarily to punish the offender and to discourage other offenses. *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509; see *Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.* (1980), 85 Ill. App. 3d 1108, 407 N.E.2d 645.

■■ In our opinion, it is not the presence or absence of possible justification for defendant's refusal to provide water which renders this a case of wilful act or omission; rather, it is the conduct by which defendant sought to implement its views, *i.e.*, by attempting to force plaintiffs to capitulate or else do without a vital service, which we believe can fairly be characterized as wilful. The term "wilful" entails an intentional disregard of the safety of others and the absence of care for the life and property of others, which exhibit a conscious indifference to the consequences of the action or inaction of a defendant. (*Mathis v. Burlington Northern, Inc.* (1978), 67 Ill. App. 3d 1009, 385 N.E.2d 780.) Here, there was certainly conscious indifference and intentional disregard for the hardship sure to be thrust upon persons deprived of water at their place of residence over a prolonged period of time. Under the circumstances, we conclude that the case at bar was a proper case for imposition of punitive damages under section 73 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 77).

However, we find that the amount of punitive damages assessed in this case, $3,500, was excessive. We note that although the amount of actual damages proved by plaintiffs was relatively small, it has been held that in Illinois punitive damages need not be awarded proportionally to compensatory damages. (*Gass v. Gamble-Skogmo, Inc.* (7th Cir. 1966), 357 F.2d 215, *cert. denied* (1966), 384 U.S. 943, 16 L. Ed. 2d 541, 86 S. Ct. 1464; *Hannigan v. Sears, Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285, *cert. denied* (1969), 396 U.S. 902, 24 L. Ed. 2d 178, 90 S. Ct. 214; 27 DePaul L. Rev. 571, 573 (1978).) Also, there is some authority that expenses and attorney fees incurred by plaintiffs in prosecuting the action may be considered in setting the amount of punitive damages. (*Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.*; 27 DePaul L. Rev. 571, 573 (1978), citing *Smith v. Dunaway* and *Ritter v. Ritter* (1943), 381 Ill. 549, 46 N.E.2d 41.) Here, attorney fees incurred by plaintiff were the subject of an express award. We are guided primarily by the fact that defendant's actions threatened inconvenience at most, not physical injury. We believe punitive damages of $1,500 would have been quite sufficient punishment and a genuine deterrent to the sort of behavior for which defendant was responsible. Accordingly, we reduce punitive damages to $1,500.

This court ordered that plaintiffs' motion for attorney fees on appeal be taken with the case. We find the motion well taken. (See Ill. Rev. Stat.

1979, ch. 111 2/3, par. 77.) We grant the motion and order payment of reasonable attorney fees which pertain directly to the defense of this appeal. We therefore direct the trial court on remand to conduct a hearing in order to ascertain the amount of attorney fees which defendant must pay.

For the foregoing reasons, the compensatory damages awarded to plaintiffs are reduced to $195; plaintiffs' punitive damages are reduced to $1,500; and this cause is remanded to the circuit court of Madison County for determination of the amount of attorney fees on appeal.

Judgments reduced; cause remanded.

JONES, J., concurs.

JUSTICE WELCH, concurring in part, dissenting in part:
While I agree with the rest of the majority's opinion, I must dissent from the reduction of the punitive damages for the reasons stated in my partial dissent in *Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1. As in that case, the majority here provides no reason to characterize the trial court's assessment of punitive damages as improper, and in the absence of such doctrine, I believe we must presume that that assessment is correct.